# THE MAYOR AND CITY COUNCIL OF BALTIMORE

## *vs.*

## THE PARK CORPORATION OF BALTIMORE ᴇᴛ ᴀʟ.

*Condemnation proceedings: market value; sewer connections;*
*value of rights.  Prayers.  Expert witnesses: discretion*
*of trial court; reviewable.*

Where the City of Baltimore seeks to condemn a restricted
right to connect a small city drain with a private drain, the
fact that the latter has a greater capacity than the combined
needs of the areas to be drained by the two drains is no reason
for awarding to the owners of the private drain nominal dam-
ages only.                                        p. 361

In such cases, the measure of compensation is not merely the
injury or damage done to the party whose property is so to be
taken, but such damage together with the benefit accruing to
the condemning party.                             p. 361

In proceedings to condemn land, the usual basis of damages
in condemnation proceedings is the market value of the prop-
erty to be taken, with due allowance for consequential damages,
if any, to the remainder, together with any special value which
the property may have for the purposes for which it is to be
used, or for which it is susceptible of being used.      p. 362

Such a rule is not applicable, in its full force, where a mu-
nicipal corporation seeks to condemn the rights for a public
drain, to connect with and enter a private drain, where there is
no exclusive and complete ownership or use to be acquired.
                                                  p. 362

A prayer in such a case is erroneous which leaves to the jury
to say what they estimate the value of the interest taken, with-
out any guide or direction as to what are the proper elements
to be included, and what items should be excluded from their
consideration.                                    p. 364

In such condemnation proceedings, a prayer was held to be
erroneous which did not furnish to the jury a guide as of what

time they should find the value of the right sought to be taken—whether as of the time when the connection was to be made, or as of the time of trial, or as of some time in the future when, by reason of some supposed enhancement in value, the worth of the right might be supposed to acquire a corresponding increase; the prayer was further *held* to be erroneous because it failed to instruct the jury as to whether the value of the connection should be according to the existing length of the drain, the right to connect with which was sought to be condemned, or whether it should be according to what it would be when the drain to be entered would be finally completed; such prayer should also direct the jury's attention to the cost of maintenance and repair.                                            p. 364

An expert on real estate values, in forming his opinion, may use the sales of other property in the same vicinity, of which he had knowledge, even though there were other sales in that vicinity of which he had no knowledge.                 p. 365

In examining an expert as to his opinion of the value of land or right sought to be condemned, he may be examined as to how he arrived at such opinion.                                 p. 365

In such proceedings, evidence as to the cost to the city of some other method of disposal of the sewage from the city's drain is improper; the issue in such a case is the proper compensation for the drain connection being condemned, not the cost of doing something else.                        pp. 365-366

In condemning a right to connect a city drain with a private sewer, it is not the flow of the drain at that time that is to be considered, but its maximum capacity.                        p. 366

When any of the testimony of a witness is admissible in evidence, its exclusion as a whole is erroneous.                 p. 366

A witness to be regarded as an expert should be shown to possess more than a general knowledge of the matters involved.
                                                              p. 367

The discretion with which a trial judge rules on the qualification of a witness as an expert is reviewable by the Court of Appeals.                                              p. 367

*Decided June 23rd, 1915.*

Appeal from the Baltimore City Court. (GORTER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.

*Robert F. Leach, Jr., Assistant City Solicitor* (with whom was *S. S. Field, City Solicitor,* on the brief), for the appellant.

*Robert P. Graham,* for the appellees.

STOCKBRIDGE, J., delivered the opinion of the Court.

In the prosecution of the work of establishing a system of drainage for the City of Baltimore the Sewerage Commission laid out and installed a system of drains from Garrison avenue to and along Liberty Heights avenue, intended to afford a run-off for a drainage area of approximately one hundred and seventy acres. This drainage area lay immediately along the western boundary of the City of Baltimore, adjoining lands which had been, or were in the process of development for suburban residences. This development had been undertaken by some of the defendant corporations, and for the purpose of rendering the land so developed more readily marketable, these corporations in connection with the Development Aid Corporation, constructed a drain or sewer (which will hereafter be spoken of as the Callaway drain) designed to carry off the rainfall and sewage from the land so developed, and ultimately to convey it into the natural water course of Gwynns Falls. The conformation of the land also made this direction the natural flow for the water accumulating on and to be drained from the area intended to be provided for by the City.

The capacity of the drain or sewer installed by the City was 59 cubic feet per second; that of the defendant companies was of varying size, its smallest capacity being 308

cubic feet, and its largest, at its point of outlet, 595 cubic
feet. The run-off for the drain having a capacity of 308
cubic feet is estimated by the engineers at 188 cubic feet, and
for the drain at the point where its capacity is 595 cubic feet,
at 400 cubic feet, thus leaving a margin not required to carry
the run-off from the respective areas of 120 and 190 cubic
feet per second.

Under these conditions, the City instituted condemnation
proceedings, the purpose of which was to enable it to con-
nect its drain, of a maximum capacity of 59 cubic feet, with
the Callaway drain, and a determination of the compensa-
tion due the companies for such connection. It is not a case
where the whole of the interest of the defendant companies
is sought to be taken, but only a portion of that interest. In
this respect it differs materially from most of the condemna-
tion cases where municipal corporations, railroads and others,
enjoying the right of eminent domain, seek to acquire an
exclusive use of land or property which is made the subject-
matter of the proceedings. There is one additional fact to
be noted before considering the law applicable to the case.
The Callaway drain or sewer has thus far been constructed to
a length of about 2,000 feet, and there still remains to be
constructed in order to effect a junction with Gwynn's Falls
about 1,335 feet.

The contention of the City is, that it is liable for nominal
compensation only. This is upon the theory that the Calla-
way drains have a capacity more than sufficient to take care
of the run-off from the area for which those drains were
constructed and the run-off from the city's drainage area com-
bined. This position is unsound. In all such cases the meas-
ure of compensation is not merely the injury or damage
done to the party whose property is so taken, but that to-
gether with the benefit accruing to the concern or corpora-
tion benefited thereby. *Drainage Comrs.* v. *Knox,* 237 Ill.
148; *Sutherland on Damages,* 3rd Ed., sec. 1064; *Taylor* v.
*Baltimore,* 45 Md. 576. For this reason the action of the
City Court was correct in refusing the first, second, third,

fourth, seventh and tenth prayers offered on behalf of the City.

In cases dealing with the condemnation of land, the usual basis of damages or compensation to be awarded is the market value of the property taken, with due allowance for the consequential damages, if any, to the remainder, together with any special value which the property may have for the purposes for which it is to be used, or for which it is susceptible of being used: *Brack* v. *Baltimore,* 125 Md. 378, and the cases there cited. But this rule is not applicable in its full force in a case like the present, where there is no exclusive and complete ownership or use to be acquired, as was well illustrated in *Taylor* v. *Baltimore,* 45 Md. 576  The term market value has, with regards to many kinds of property, a definite, well understood meaning, some of the essentials for which are lacking in the present case. The witness Whitman testifies to a number of contracts which he says were made, under which the run-off from particular lots or tracts of land, and including the house sewage, into the Callaway drain, were provided for. But he testifies only as to the amounts charged, not as to any conditions or agreements which may have been embodied in the contracts, nor does he pretend to say that the contracts so testified to were all of the contracts which were made, nor were the contracts themselves produced in evidence. Those which Mr. Whitman does testify to show a wide range in the amount paid for the sewer connection. Thus the Lentz contract was for $2.25; the Bond and Williams, $2.50, and the Forest Park, $2.85 per front foot, while the Brown and Megary contracts were $50, and the Biddle contract $75 per house, flat. The absence of anything approaching a uniform standard of value is further emphasized by Mr. Whitman, when, in an endeavor to reduce to a common basis, he testifies that the value of the City's run-off of 59 cubic feet on the basis of the Lentz contract would be $14,800; the West Forest Park, $20,620; the Brown, $23,600; the Bond and Williams, $36,600; the Bid-

dle, $37,500, and the Megary, $53,000, or if the amounts be taken on the basis of the computed run-off per cubic foot, the Lentz contract has a value of $250, the West Forest Park of $350; the Brown of $400; the Megary of $625, and the Biddle of $635. These several figures have been given, not as tending to establish the value of the compensation to be paid by the City, but as showing the inadequacy of the data for even approximating the market value, or even showing that there is any basis which can be regarded as tending to show a market price. It may have been that the contracts testified to contained different stipulations and conditions, which may have been important factors in determining the price and so explaining, in some measure at least, the manifest inequalities; but, if so, they were not before the jury to aid it in reaching a proper conclusion, and certainly there is nothing before this Court from which it can be said with regard to the kind of interest to be taken under this proceeding, that there was any legally sufficient evidence of an established market price. The jury might take the sums agreed to be paid under these agreements, to be considered in connection with their own view of the property, and the other evidence, for what the jury might consider them worth, but not as a controlling factor or establishing a definite market price. For these reasons no error can be ascribed to the trial Court for its refusal to grant the fifth, eighth and ninth prayers offered on behalf of the City

No error is perceived in the action of the Court in the granting of the defendant's first and third prayers, or in overruling the City's special exception to the third prayer, for reasons already sufficiently indicated.

The second prayer of the defendants relates to the measure of damage or compensation to be awarded, and was as follows:

"The defendants pray the Court to instruct the jury that the measure of damage in this case is the market value established in the neighborhood for the services so taken by

the City, if they shall find such market value, and based upon the ultimate capacity of the drain installed, or to be installed, by the City, and in event they are unable to find such market value, they are to find such an amount as they think will be proper compensation to the defendants for the burden which such drain would impose upon them, and by ultimate capacity is meant such a quantity of water as the said drain, as constructed by the City through the Sewerage Commission, can, or will, be called upon to discharge into the drain system of these defendants."

This prayer practically left it to the jury to say what they might estimate the value of the interest taken without guide or direction as to what were proper elements to be included, and what should be excluded from their consideration. Thus they were left without guide as of what time they were to find the value, whether as of the time when the connection was made, the time of the trial, or some time in the future when, by reason of some supposed enhancement in value, the worth of the right might be supposed to have acquired a corresponding increase; nor were they told whether they were to consider the value of a connection with a sewer 2,000 feet long, or with one having a length of 3,335 feet; nor was the question of the repair and maintenance of the sewer, at whose cost and expense that was to be done, called to their attention. This prayer was, therefore, open to the same objection as the damage prayer in *Belt Line R. R.* v. *Sattler,* 102 Md. 595, with regard to which this Court said:

"It was the duty of the Court to have pointed out and limited the items of loss for which the plaintiff might recover under the testimony. This was not done by the granted prayer, but the jury was left very much at large as to the question of damages."

So in this case the damage prayer was too general, and the granting of it in the form in which it appears in the record was error.

In the course of the trial ten exceptions were reserved to rulings upon evidence. These can be very briefly disposed

of. The first was to permitting the witness Whitman to give an opinion as to the value of the interest to be acquired by the City in the Callaway sewer. The witness had fully qualified as an expert, and had testified that he was familiar with some contracts for drainage in the area drained by the Callaway sewer. As an expert upon a subject, knowledge of which was peculiarly within the province of an engineer such as Mr. Whitman was, it was competent for him to express an opinion, the value of which could be tested upon cross-examination. If the effect of the question had been to limit his opinion solely to the knowledge which he might have acquired from examining some selected contracts, the objection would have been well taken, but the Court understands the question to have been broader than that, and to call for an expression of opinion of the witness as formed from his general knowledge of the subject, taken in connection with an examination of some of the contracts in relation to this specific drain. The position is analogous to that of an expert called to testify to the value of real estate. He may use the sales of other property in the same vicinity, of which he has knowledge, in forming his opinion, even if there have been other sales of which he has no knowledge. There was no error committed by the Judge of the City Court in permitting the witness to answer the question.

After having given the opinion as to the value of the right to be acquired, the witness was asked to state how he arrived at the figures he had given. This gave rise to the second exception. The ruling of the Court on this was clearly right. In no way could the jury be better informed as to the weight to be given to the valuation which had just been testified to; *Belt Line* v. *Sattler,* 102 Md. 602. After having testified to his opinion as to the compensation proper to be made to the defendants by the City, the witness was asked as to the other methods available to the City for the disposal of the sewage to be emptied from the City's drain into the Callaway sewer, and the cost of such methods. The answers to these questions the Court was asked to strike out, and the

ruling on this motion constitutes the third exception. This evidence was clearly inadmissible. The issue before the Court was not the cost of doing something else, but the proper compensation for the connection which the City was condemning.

"The word compensation imports that a wrong or injury has been inflicted and must be redressed in money. Money must be paid to the extent of the injury. This may be less or more than the value of the property taken" *Sutherland on Damages,* 3rd Ed. sec. 1063. The cost of doing an entirely different thing could shed no light upon the injury done or the just compensation to be paid.

The fourth exception was substantially the same as the second, and need not be further discussed.

The fifth exception was reserved to permitting the witness Whitman to answer the question whether the paving of Garrison avenue had increased the flow of water in the direction of the Callaway drain. The evidence which an answer to this question would elicit was immaterial, because no greater quantity of water could be discharged from the drain of the City, into the Callaway sewer than 59 cubic feet per second, the capacity of the drain, and in estimating the compensation to be paid the jury were bound to reach their finding, not on the amount actually flowing in at any one time, but on the maximum capacity of the drain. It was, therefore, error to have admitted this evidence, but the error was not of so serious a nature as to require a reversal of the judgment, if there had been no other error.

The sixth exception was reserved to the refusal of the trial Court to strike out the entire testimony of the witness Whitman. This motion was too broad. Much of the testimony of the witness was pertinent to the issue involved, and the Court was correct in its refusal to strike out all of his testimony.

The seventh, ninth and tenth exceptions were to the action of the Court in permitting the witnesses Sucro and Sutton to give evidence as to the value of the right to enter the

Callaway sewer. Each of these witnesses was placed on the stand as an expert, but neither showed any special qualification to so testify apart from the fact that they were civil engineers by profession, and had had exhibited to them some contracts under which individuals or corporations had been given the right to enter the sewer. It may fairly be questioned whether any question of valuation is more difficult of proper and just solution than the one presented in this case. Any witness to be regarded as an expert should be shown to possess more than a general knowledge of the matters involved. While with regard to the necessary qualifications to entitle a witness to testify as an expert, much must be left to the discretion of the trial judge, it is impossible to see that either of these witnesses had shown himself possessed of that technical knowledge which would have entitled him to testify to value, other than that possessed by any civil engineer. The objection in each of these exceptions should have been sustained

And for the same reason the motion to strike out the testimony of Sucro as to value, which constitutes the eighth exception, should have been sustained, and for the further reason that he based his estimate of proper compensation upon what he had been informed was the price paid under one contract, that with Lentz. No value for any right such as the one at issue here can be predicated upon a single, isolated transaction, which may have been induced by any one or more of a wide variety of considerations.

For the reasons indicated the judgment appealed from must be reversed.

> *Judgment reversed, with costs to the appellant, and case remanded for a new trial*