In the Matter of the City of New York, Relative to Acquiring Title to Real Property Required for the Cross-Bronx Expressway, in the Borough of The Bronx.

Supreme Court, Special Term, Bronx County, July 20, 1948.

*John P. McGrath, Corporation Counsel (H. E. O'Donnell, E. A. Weingarten, R. Abberman* and *A. Cohen* of counsel), for City of New York.

*Alfred J. Talley* and others, for claimants.

HAMMER, J.  The property which is the subject of this proceeding constitutes a wide strip of land extending from the westerly

side of Westchester Creek in the easterly Bronx to the east bank of the Harlem River in the west Bronx. The land has been acquired to provide a cross-borough express highway which will facilitate access not only between the approaches to the George Washington Bridge on the westerly end and Whitestone Bridge on the easterly end, but also between this new highway and existing and proposed streets and highways bearing the north and south traffic through The Bronx. The magnitude of such a project is obvious, considered alone, but when considered in connection with existing improvements such as Henry Hudson Parkway, Sawmill River Parkway, Bronx River Parkway, Hutchinson River Parkway, Major Deegan Expressway, Bruckner Boulevard and the proposed improvement of the former and also the proposed Boston Road and New England Expressways, the vast design of the overall plan becomes apparent. These improvements will change, to a considerable degree, the highway and street plan of the borough, directly, and indirectly the improvement will be beneficial throughout the metropolitan area. Integrated as they will be into the comprehensive scheme for the entire city a tremendous acceleration in the movement of vehicular traffic should be accomplished. The need therefor has been demonstrated more and more to be necessary by the seemingly endless demands brought about by ever-increasing numbers of commercial, pleasure and other vehicles using the streets, boulevards, parkways and other arteries of transportation in this great metropolitan area. Over these great modern highways and through the gateways of the city's bridges and tunnels much of this ever-increasing flow of vehicular traffic will pass to and from other magnificent systems of State, National and international highways, and every agricultural, industrial, commercial, political and recreational center of the United States, Canada, Alaska and Mexico, will be brought into more and more intimate automotive contact with the city of New York. Wisdom, vision and courage of the highest order in road planning and building, as well as in civic enterprise are indeed required to meet the challenge of this city's future greatness.

The land taken for this Cross-Bronx Expressway has been divided into three sections. The most easterly section, running from the west side of Westchester Creek to Longfellow Avenue, has been designated section 3. Title to this portion vested in the city by order of this court, made March 15, 1946, by the late Mr. Justice McLaughlin. Some delay ensued, due to his illness and lamented death.

Thereafter, the trial was had as soon as the regular assignments and other additional condemnation assignments of the present Trial Justice permitted. Damage parcels 511 to 967 are in the third section. The route of the expressway in this section follows closely the bed of East 177th Street. This street diagonally crosses the avenues in this part of The Bronx, with the result that there are many unusually shaped parcels and consequent numerous partial takings. A preliminary analysis of the situation made in connection with the viewing of the property, as required by the statute, disclosed that the trial would be greatly facilitated by dividing this section into two parts. This was done and the dividing line located at Hugh J. Grant Circle. That part lying east thereof was set down for trial on April 19, 1948, and the part west thereof for June 21, 1948. Aside from some minor matters the trial of the easterly portion of this section required ten court days, on many of which the sessions continued into the evenings, so that the trial could be completed before the commencement of the May term of this court, at which the Trial Justice had another calendar assignment. Briefs were received on or about June 8, 1948, and immediately thereafter the fixation of values undertaken. In the meantime, from June 21st through July 2d, the second part of the third section was tried.

In order to facilitate consideration and decision the present Trial Justice has devised a chart of appraisal items deemed appropriate to or necessary in every known claim, excepting, of course, such as might be extraordinarily unique. The claimants and the city were required to furnish the data. Obviously, all items were not required for every claim. Unimproved property had relation only to a few. But time has been saved and the labor of the court has been lightened by the use of the chart and its data and by the helpful co-operation of counsel in its acceptance and use. Because of this reference to such chart in the interest of clarity a copy will be appended to this decision.

In view of the magnitude of this proceeding, involving this most important new artery of transportation, running completely through the borough of The Bronx from east to west from Whitestone Bridge to George Washington Bridge and the vast territory to which they lead, and being mindful of the number and variety of the properties taken and the complex factual and legal problems presented, it is deemed necessary to state some observations and rules which constitute applicable and timely guides in consideration and decision.

The owner of private property taken for a public purpose under eminent domain is entitled to just compensation judicially determined. Just compensation is an award of money for the value of the property as of the time of taking to indemnify the owner for the loss. As the taking of real property is involved, the ordinary rules of compensation are applicable, but qualified by the additional element of market value. While in some jurisdictions the value to the taker is considered as an element and reflected in the sum which must be determined, the rule in New York allows only the fair market value.[10] In damage or injury there is a wrongdoer, but the property may be retained by the owner or the wrongdoer may receive no benefit. In condemnation the taker legally and completely deprives the owner of both the property or interest, and its use or enjoyment, and appropriates same for the taker's use. There is also a class of injury in the public interest under police power involving partial or complete destruction from which no damage ensues. Eminent domain takes property for a necessary public use. The police power regulates the use of property or restricts rights in property when the free use or unrestricted exercise of such rights is detrimental to public interest.[2]

A partial taking under condemnation of an owner's real property, leaving the remaining land damaged by serious impairment to its value due to the taking and the resultant size, shape, or serious sales impairment of the portion left, may be said to be an exception to the constitutional requirement of compensation only for the value of the property taken. When the property taken is physically and not merely functionally an integral part of a larger plot, and what is left is substantially deteriorated by reason of the significant relationship in value of that taken to the entire property, the obvious resulting consequential damages to the remaining part are allowed[2a] as part of the sum awarded therefor and for the value of the property taken;[3] or in others an award is made first for the value of the part taken and then damages to the remainder,[4] which may either be stated separately or in a lump sum,[5] or even by an award for difference between the fair market value of the property before and after the taking in which just compensation is measured by the difference between the value of the whole before the taking and the value of the remainder after the taking.[6]

In New York a statute enacted to require the ascertainment of the value of the entire property first before taking and then

in the condition it would be in after the taking, and constituting the measure of compensation as the difference in value, be it more or less than the separate value of the part taken, was declared unconstitutional.[7] The reason assigned was that such a requirement operated to set off benefits against the value of the part taken.[7] This same reasoning seemed to prevail in a street widening proceeding.[8] But on the retrial the trial court first found the value of the whole before the taking and then the value of the part left after the taking, and awarded the difference as the just compensation. The owner appealed on the ground that benefits were set off against the value of the part taken, citing *Matter of City of New York (Water Front)*.[7] The city's position was that benefits were not offset, but, on the contrary, the award represented the actual loss or consequential damage sustained by the owner. The affirmance by the Appellate Division was affirmed by the Court of Appeals,[9] per CRANE, J., with the statement (p. 29): "How, then, should this strip of land taken by the city be valued? By finding the difference between the fair market value of the whole before the taking, and the fair market value of what remains. This is the general measure of damages for property situated and conditioned as the block here in question." However, the accepted New York formula in fixing an award for a partial taking is that of the value of the part taken plus damages to the part left, with care exercised to prevent an overlapping and the giving of double damages or an elision which would withhold adequate or just compensation.

The New York law of compensation, both in respect of entire and partial taking by eminent domain is well stated in *Matter of City of Rochester (Smith St. Bridge)* (234 App. Div. 583, 586–587) as follows:

"If the entire property is taken, * * * the owner is entitled to the fair market value of the entire property at the time of the appropriation; in other words, the price which the property would bring in the market when offered for sale by one who desired but was not obliged to sell, and when purchased by one who was not compelled to buy.

"If a portion only is taken, the owner is entitled to be compensated for the difference between the fair market value of the entire property and that of the remainder, after the needed portion has been pre-empted. [Cases cited.]

"In determining the value of the portion not taken, all damages resulting thereto by reason of the use to which the part

appropriated is to be put must be taken into consideration. [Cases cited.] "[10]

Upon condemnation a lessee under a lease is entitled to compensation for the value of the unexpired term, based upon the difference for such period between the fair annual rental value of the demised premises and the rent reserved.[11] But if the lease contains a clause that it shall cease and come to an end upon the taking of the property for condemnation, the lessee is not entitled to any compensation or to share in the award to the owner-lessor.[12] An option to buy the property contained in a lease gives the tenants no right to the award or a share of it unless the option has been exercised at the date of the condemnation.[13] Any claim by the lessee is waived by a clause agreeing that the award will be paid to the lessor without deduction.[13] But a lessee who under agreement with the owner-lessor has erected a building on the land is entitled to an award unless he has also limited or waived his right thereto.[14] In some instances, such as change of grade, where the lease has an unexpired term of at least three years, both lessor and lessee have a separate right to an award.[15] A mortgagee who appears and proves his claim is entitled to be paid the amount of the mortgage and interest at 6%[16] (which since was reduced to 4% by section 3-a of the General Municipal Law in effect July 1, 1939; L. 1939, ch. 954) out of the award.[17] While extinguished on the vesting of title[18] the mortgage if proved is a lien on the owner's award.

The law of condemnation is said to be grounded upon the realization that eminent domain is government interference with, and the taking by it or under its authority, of private property for public use safeguarded by the constitutional requirements of due process and just compensation. The problem appears to be not merely one of damages, but involves ethical, psychological and economic elements. The psychological element arises because the exercise of the power is *in invitum*, the economic element by reason of the necessity of proper allocation of the costs of the condemnation, and the ethical element because fairness is required even to diffident and seemingly uninterested owners and others entitled to compensation.

Stated in terms of elementary economics, there is a reciprocal relationship between economic rent and the institution of private property in land. The right to dispose by bargain springs from the inalienable right or public sanction of private property. If land were not held as a private possession for the

owner's personal economic advantage, there would be no contractual economic rent. The best economic use is that which produces the maximum surplus. Under that theory in farming, that crop is produced first which returns the greatest surplus, and is continued until another crop excels, when the second is produced, to be followed in like order by others in the order of their profitableness. This may be varied somewhat for long-range benefit by the prudent farmer through withholding and sacrificing present profit planting for a limited period in the interest of preserving fertility. Production of certain exclusive crops and the form of cultivation peculiar to them, if long continued, may result in a type of class civilization characteristic of those engaged, and reflecting peculiarities of the underlying economics. The ways of life thus created may be regarded, depending on viewpoint, as mellowed by age and hallowed by tradition, or as significant of a narrow classism and selfish bigotry deterrent to general progress. The social order thus established is resentful of and vigorously opposed to any proposed or threatened change. An example was the struggle between the immense ranches of American cattle '' barons '' and the farmers who fenced field for raising sheep and mixed crops. Economic rent is not a price-determining cost of production. On the contrary, the cost of production and price are factors of economic rent. Demand remaining stationary, increased production reduces the prices. The demand increasing brings increased price which usually causes the emergence of economic rent. Price is not high because rent is paid; but rent is paid because price is high.[18] Cost is influenced by a limitation or increase in the quantities of land, labor and capital available for other uses and the consequent raising or lowering of prices. The distribution of land in cities among different uses determining the location of the city's enterprises is determined by the law of comparative economic rent. Self-interest of owners and tenants influences the assignment of each plot to the use which will produce the maximum income. For each use a set of conditions tests relative fitness for available land. Theatre, hotel, shopping and residence districts are such as they become, or appear likely to be, particularly productive for their respective uses. Certain tests of relative fitness of available sites for such uses are applicable: '' In the case of retail wholesalers and light manufacturing, proximity to the retail stores which are their customers; in the case of wholesaling or manufacturing, proximity to transportation; and in

the case of public or semi-public buildings, for historical reasons proximity to the old business center. Hotels of various classes seek locations similar to the retail stores of the same classes on convenient traffic streets which advertise them. The highest class apartment hotels seek locations on or near such traffic streets as run through or near the fashionable districts. Below this grade the various classes of flats seek locations for the convenience of their tenants, tending to draw nearer and nearer their tenants' places of business until finally we reach the tenements crowded among the factories where their occupants work. The basis of residence values is social, not economic, the rich selecting the locations which please them, those of moderate means living as near by as possible, and so down the scale of wealth, the poorest workmen taking the leavings, either adjacent to such nuisances as factories, railroads, docks, etc., or far out of the city. Certain features appear to attract the wealthy in selecting their residence district, among these being nearness to parks, a good approach from the business centre, not too far nor yet too near, a moderate elevation if obtainable, favorable transportation facilities despite the fact that the rich ride in their own * * * automobiles, and above all absence of nuisances." [19]

Mr. Justice BURTON, speaking for the United States Supreme Court in a leading decision in condemnation, said (p. 81): " the value of the property to the Government for its particular use is not a criterion. The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes." [20]

Mr. Justice HOLMES also stated (p. 195): " The question is what has the owner lost, not what has the taker gained." [21]

Commenting on whether the distinguished jurists had any real distinction in mind, Lewis Orgel, a recognized authority on eminent domain, made what is undoubtedly the correct observation, as follows: " Both judges were probably thinking of ' fair market value ' as constituting an acceptable measure of ' what the owner has lost '. Indeed, so far as we are aware, the Supreme Court has never conceded that the special value of a property for the taker's uses should even be considered, except in so far as it may be relevant to the determination of ' fair market value.' And this has been the position of nearly all other courts, although there have been a few possible exceptions." [22]

In New York, in the ascertainment of just compensation, the old rule which did not permit evidence of sales on direct examination[23] has been changed by statute, and evidence of sales prices is now admitted on direct examination, and not limited to cross or redirect examination,[23a] and undue delay and surprise in the trial is now avoided. Sales are so admissible when included in a notice that they will be offered in evidence upon the trial. Such sales are subject to examination before trial of the parties and in special instances of third parties. There appears to be no valid objection to the exchange of written appraisals, including supporting and underlying information and factors at the opening or even in advance of trial. While expert opinion is still the usual method of proving market value, the view of the property, by the trier of the facts, and his or their general knowledge of value gained from practical experience and analyses of the opinions by known appraisal checks may lead to a conclusion at variance with such testimony.[24]

As real property alone is taken and it alone requires compensation, incidental losses sustained by the owner are excluded, as too speculative to be considered, the pecuniary extent could not be reasonably accurately determined, or no such damage could be reasonably fixed, estimation of the probable cost of the property appropriated would be impracticable, if not impossible of estimation in advance, and to leave them open for adjudication would discourage, if not prevent, public improvement.[25]

While an owner is entitled to show as bearing upon the question of value, any fact which the owner would naturally and properly bring to the attention of a buyer with whom he was negotiating a sale, care must be exercised that the mere hope of the owner that the property might be used for some special purpose is not substituted for reality (*Matter of City of Rochester* [*Smith St. Bridge*], 234 App. Div. 583, 586, *supra,* and cases cited). There also was stated a rule which has particular applicability here (p. 587): " It is true that certain claimants were permitted to show the profits made by them in the business which they conducted on their property. This we think was error. It is the land which is appropriated, and not the business conducted thereon. While it is proper to show, as bearing on the value of the property, that it is peculiarly adapted for any particular business, the success of an enterprise does not depend upon its location alone, but rather upon

the skill and ability of the proprietor, and the manner in which he conducts his business. One will often succeed where another will fail. Damage occasioned to an owner's business, because he is compelled to move to another location, is not an item which can be considered by a commission in a condemnation proceeding. (*Matter of Department of Public Works,* 53 Hun 280, 300, 301; *Matter of Gilroy,* 26 App. Div. 314; *Sauer* v. *Mayor,* 44 id. 305, 308; *City of Syracuse* v. *Stacey, No. 1,* 45 id. 249, 259; *Banner Milling Co.* v. *State of New York,* 240 N. Y. 533, 540.)

" Neither can an owner recover the expenses incurred in removing personal property from lands condemned to another location. (*Matter of N. Y. C. & H. R. R. R. Co.,* 35 Hun, 306; *Matter of New York, West Shore & Buffalo Co.,* Id. 633; *Ranlet* v. *Concord RR. Corp.,* 62 N. H. 561.)"

In this regard the court was also mindful of a statement of legal principle in *Sparkhill Realty Corp.* v. *State of New York* (254 App. Div. 78, affd. 279 N. Y. 656): " In eminent domain proceedings one who is deprived of his property should be permitted to prove all factors which are relevant in fixing its value. There is no well-considered case which holds that profits may never be considered as an element of value. Profits may be recognized as an important item and are only excluded in cases where the evidence is too speculative. ' Each case necessarily involves different facts and must be considered by itself. Only a few general rules apply on the question of valuation in condemnation proceedings, and even these may yield to exceptional circumstances.' (*Banner Milling Co.* v. *State of New York, supra* [240 N. Y. 533].) The usable value of the property for any suitable legitimate business is always relevant in fixing its market value. (*Reisert* v. *City of New York,* 174 N. Y. 196; *Baumann* v. *City of New York,* 227 id. 25.) The prospective use of the property and its potential value for such use may be considered. (*Balshan* v. *State of New York,* 230 App. Div. 142, affd. 255 N. Y. 596.) As was said by the court in *Langdon* v. *Mayor, etc.* (133 N. Y. 628): ' But it is the potentialities of a given piece of property, both developed and undeveloped, which constitute its chief element of value.' "

Some evidence was received here which might be regarded as technically erroneous to show profit as such to be reflected in value, but competent to show profit reflecting adequate use or best available use (*Banner Milling Co.* v. *State of New York,* 240 N. Y. 533). It was taken merely for what it was worth,

and the rule of *Matter of City of Rochester* (*supra*) just referred to shows its value should be considered with great care. In any event, the damages here being awarded are to be fixed by the court in accordance with recognized proper standards, and receipt of such evidence would not be substantial error unless it materially increased the amounts awarded. It did not influence such an increase, the awards here being not more than just compensation.

Improvements made by the taker in advance of authority in condemnation are considered in ascertaining just compensation to the owner, but not the cost of such improvements, nor their intrinsic, replacement or sound value nor the value of their use to the taker, but how much do such improvements enhance the value of the land.[26] But the cost or structural value, while not the measure, are factors, in some instances of little value, and in others, where suitable to land and locality, of importance in determining the value of the property.[27]

Except under unusual circumstances, the actual earnings of multiple dwelling and other improved properties form the factual basis for economic value.

In approaching this phase of valuation, the chart (pp. 858–859, *infra*) makes provision for (a) a comparison between the opposing experts' opinions as to the net realizable income inherent in the property under review, and the net income actually realized by the owner through the operation of the property.

Estimates of earnings out of conformity with actual earnings should, in the main, be disregarded except when accompanied by some convincing proof as to why they form a more reasonable basis for valuation than actual earnings; for example, poor earnings due to excessive and abnormal vacancies or to poor management; another example is abnormally high earnings by reason of better than normal occupancy or through excessive temporary income due to a particularly fortuitous lease.

In considering income for capitalization purposes, it is usually essential to deduct (in most cases) a normal reserve for vacancies. This is generally calculated at 10%. Thus the resultant capitalization figure is based on normal earnings and does not excessively penalize property in " bad times " nor inflate its value in " boom times ". It is axiomatic that a reasonably prudent investor will provide such a safety margin in his calculations in weighing the relative attractiveness of a new investment.

It is also important to carefully scrutinize " actual " operating expenses, since in any one year they are apt to include either a substantial capital investment or at least disbursements which are more properly spread or prorated over a number of years, depending upon the life of the particular improvements.

The standard practices and factors above outlined as well as the rules and tables in common use, such as the Hoffman-Neil Rule, the Hanley Scale, the Davies Rule and Inwood's Table, have all been given due consideration. On the occasion that these or any of them were helpful they were applied, bearing in mind that none was controlling and that actual value must always depend on such factors as the use to which a property may be put and its marketability.

In determining the value of parcels in common use, consideration has been given to the increment of value, if any, which may be reflected to the less valuable parcel from the more valuable one by reason of such use.

Prior to the death of the late Mr. Justice McLAUGHLIN, some formal proof had been offered in evidence by the City of New York and some testimony taken relating to fixture claims and settlements. By stipulation between the parties, this testimony and these statements were included by reference in this proceeding. To the extent that the parties agreed to permit these settlements to stand, the same are approved and ratified at this time. All the evidence and exhibits which were introduced before Mr. Justice McLAUGHLIN have been considered, and the same rulings with reference to the evidence as were made by him are adopted, allowing appropriate exceptions where taken.

The claim of the Metropolitan Life Insurance Company with reference to damage parcel No. 797 has been adjusted in the sum of $160,000 in accordance with the statements of the various counsel interested, including those having fixture claims as appears in the minutes at pages 13 and 14. This settlement is approved.

The taxes paid by the claimants in damage parcels Nos. 902, 903, 908 and 909, which had not become a lien at the time of vesting of title, shall be repaid these claimants.

Where mortgagees have requested payment of awards to them, provision therefor shall be made upon proper proof being submitted to the corporation counsel.

(The awards made for the various damage parcels are omitted.)

The corporation counsel is directed to submit a separate partial tentative decree accordingly.

[1] U. S. Const., 5th Amendt.; 14th Amendt., § 1; N. Y. Const., art. I, §§ 6, 7; *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago*, 166 U. S. 226 (1897); *McCoy* v. *Union Elevated R. R. Co.*, 247 U. S. 354 (1918); and see splendid articles on condemnation by Attorney-General Nathaniel L. Goldstein, N. Y. L. J., Jan. 9, 1946, p. 104, col. 1; March 11, 1946, p. 962, col. 1; March 13, 1946, p. 994, col. 1, and March 27, 1946, p. 1192, col. 1.

[2] *Town of Windsor* v. *Whitney*, 95 Conn. 357, 368, Note, 12 A. L. R. 679; *Commonwealth* v. *Plymouth Coal Co.*, 232 Pa. 141, 150; *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 417, Note, 28 A. L. R. 1330; *Duckett & Co.* v. *United States*, 266 U. S. 149, 151; *United States* v. *Welch*, 217 U. S. 333, 339.

[2a] *South Buffalo Ry. Co.* v. *Kirkover*, 176 N. Y. 301.

[3] *Louisiana Soc.* v. *Board of Levee Comrs.*, 143 La. 90.

[4] *Matter of Grade Crossing Comrs. of City of Buffalo*, 146 App. Div. 883; *Union Ry. Co.* v. *Raine*, 114 Tenn. 569.

[5] *Hutches* v. *Borough of Hohokus*, 82 N. J. L. 140; *United States* v. *Grizzard*, 219 U. S. 180; *Essex Storage Elec. Co.* v. *Victory Lumber Co.*, 93 Vt. 437; *Harvey* v. *Lackawanna & Bloomsburg R. R. Co.*, 47 Pa. 428.

[6] *Adirondack Power & Light Corp.* v. *Evans*, 226 App. Div. 490, 495; *Matter of City of New York (4th Ave.)*, 255 N. Y. 25, 29; *Matter of City of New York (West 10th St.)*, 267 N. Y. 212; *Matter of Bd. of Supervisors, Herkimer County*, 140 Misc. 894, 897.

[7] *Matter of City of New York (Water Front)*, 190 N. Y. 350.

[8] *Matter of City of New York (4th Ave.)*, 125 Misc. 133, revd. 221 App. Div. 458, affd. 247 N. Y. 569.

[9] *Matter of City of New York (4th Ave.)*, 229 App. Div. 757, affd. 255 N. Y. 25, 28–29, certiorari denied 283 U. S. 860; cf. *Matter of Nassau Co. (McNeil Ave.)*, 238 App. Div. 863, and opinion on appeal after retrial, 246 App. Div. 757.

[10] See, also, *Matter of Bd. of Public Improvement of City of New York*, 99 App. Div. 576, 580; *County of Erie* v. *Fridenberg*, 221 N. Y. 389, 393; *Duncan* v. *Nassau Elec. R. R. Co.*, 127 App. Div. 252, 254; *Matter of Jacquinto Realty Corp.* v. *Ormond*, 217 App. Div. 76, 82, affd. 247 N. Y. 528; *Matter of LeRoy St.*, 188 App. Div. 58, 59; *Matter of City of Rochester (Smith St. Bridge)*, supra.

[11] *Matter of City of New York (7th Ave.)*, 196 App. Div. 451.

[12] *Matter of City of New York (Upper N. Y. Bay)*, 246 N. Y. 1, revg. 219 App. Div. 382, 387, in part.

[13] *Matter of City of New York (Upper N. Y. Bay)*, supra, p. 33; *Matter of City of New York (Pier Old No. 11)*, 124 App. Div. 465, affd. 192 N. Y. 539.

[14] *Matter of City of New York (North Riv. Waterfront)*, 219 App. Div. 27.

[15] *103 Park Ave. Co.* v. *Exchange Buffet Corp.*, 242 N. Y. 366, writ of error dismissed, 274 U. S. 722; see Greater New York Charter, § 951, as amd. by L. 1920, ch. 786.

[16] Greater New York Charter, § 979; *Irving Trust Co.* v. *Hughes*, 239 App. Div. 74; *German Sav. Bank* v. *Dunn*, 75 Misc. 251, affd. 150 App. Div. 928.

[17] *Matter of New York (Belmont Ave.)*, 218 N. Y. 721; *Merriman* v. *City of New York*, 227 N. Y. 279; *Matter of Sea Beach Ry. Co.*, 196 N. Y. 533.

[18] Elementary Economics, Vol. II, ch. XXXII, p. 135 *et seq.*, by Fairchild, Furniss & Buck, Yale Univ.

[19] Elementary Economics, Vol. II, ch. XXXII, pp. 131–132, by Fairchild, Furniss and Buck, Yale Univ., citing Principles of City Land Values, 1903, by Richard M. Hurd.

[20] *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53.

[21] *Boston Chamber of Commerce* v. *City of Boston*, 217 U. S. 189.

[22] Orgel, Valuation under Eminent Domain, p. 259, citing as exceptions *Mayor of Baltimore* v. *Park Corporation*, 126 Md. 358, 361; *Hilcoat* v. *Bird*, 10 C. B. 327, 138 Eng. Rep. 132; *Stebbing* v. *Metropolitan Bd. of Works*, L. R. 6 Q. B., 37; *Robb* v. *Maysville & Mt. Sterling Turnpike Road Co.*, 3 Metc. [Ky.], 117; *Henderson & Nashville R. R. Co.* v. *Dickerson*, 17 B. Mon. [Ky.], 173, 178; *Producers' Wood Preserving Co.* v. *Comrs. of Sewerage*, 227 Ky. 159; *Virginia & Truckee R. R. Co.* v. *Henry*, 8 Nev. 165; *Beale* v. *City of Boston*, 166 Mass. 53, 55; *May* v. *City of Boston*, 158 Mass. 21, 29; *Guyandot Valley Ry. Co.* v. *Buskirk*, 57 W. Va. 417, 424; *Durham & Northern R. R.* v. *Trustees of Bullock Church*, 104 N. C. 525, 531; *Matter of Bd. of Supervisors, Herkimer County*, 140 Misc. 894, 899, *supra; Hall* v. *City of Providence*, 45 R. I. 167; *San Diego Land & Town Co.* v. *Neale*, 78 Cal. 63, 67; *Chicago & Northwestern Ry. Co.* v. *Chicago & Evanston R. R. Co.*, 112 Ill. 589, 607; *City of Chicago* v. *Farwell*, 286 Ill. 415.

[23] *Matter of Thompson*, 127 N. Y. 463; *Jamieson* v. *Kings County Elevated Ry. Co.*, 147 N. Y. 322; *Robinson* v. *New York Elevated R. R. Co.*, 175 N. Y. 219; *Matter of City of New York (Parkway)*, 150 App. Div. 482; *Matter of City of New York (Chrystie St.)*, 236 App. Div. 321, affd. 260 N. Y. 583; *East Pa. R. R.* v. *Hiester*, 40 Pa. 53; *Pittsburgh & Western R. R. Co.* v. *Patterson*, 107 Pa. 461; *Pittsburgh, Va. & Charleston R. R. Co.* v. *Rose*, 74 Pa. 362; *Schonhardt* v. *Pa. R. R. Co.*, 216 Pa. 224; *Roberts* v. *Philadelphia*, 239 Pa. 339; *Girard Trust Co.* v. *Philadelphia*, 248 Pa. 179; *Pennsylvania Co. for Insurances on Lives* v. *Philadelphia*, 268 Pa. 559; *Serals* v. *West Chester Borough School Dist.*, 292 Pa. 134.

[23a] Administrative Code of City of New York, § B15–1.0; Report on Law and Procedure in Condemnation applicable to proceedings brought by the City of New York, submitted to Hon. John J. W. Hilly, Corporation Counsel of the City of New York, by Leonard M. Wallstein, Special Assistant Corporation Counsel, dated Jan. 28, 1932.

[24] *Matter of Bd. of Supervisors, Herkimer County*, 140 Misc. 894, 899, *supra; Matter of City of New York (Blackwell's Is. Bridge)*, 198 N. Y. 84, 92; *New York Central & Hudson Riv. R. R. Co.* v. *Newbold*, 166 App. Div. 193, 195.

[25] *Matter of Bensel*, 151 App. Div. 451, 453; *Matter of Culver Contr. Corp.* v. *Humphrey*, 268 N. Y. 26.

[26] *Matter of Long Is. R. R. Co.*, 6 Thomp. & C., 298; *Matter of New York, West Shore & Buffalo Ry. Co.*, 37 Hun 317; *Philadelphia, Reading & New Eng. R. R. Co.* v. *Bowman*, 23 App. Div. 170; *Village of St. Johnsville* v. *Smith*, 184 N. Y. 341; *Matter of Trustees of Village of White Plains*, 124 App. Div. 1.

[27] *Matter of City of New York (Blackwell's Is. Bridge)*, 198 N. Y. 84, *supra.*

# 858

## CHART OF APPRAISAL ITEMS

Supreme Court, Bronx County, Special Term, Part II, Hon. ERNEST E. L. HAMMER, Justice

Proceeding:

Damage Parcel No. ___ Block ___ Lot ___ Corporation Counsel ___ Page No. ___

Premises ___ Assistant in Charge ___ Claimant's Attorney ___

Counsel ___

| DESCRIPTIVE DATA | City's Expert | Claimant's Expert | ANALYSIS OF LAND VALUE | City's Expert | Claimant's Expert |
|---|---|---|---|---|---|
| LAND — Name | | | Frontage | | |
| Dimensions | | | Depth | | |
| Location | | | Corners | | |
| Zone | | | Keys | | |
| Neighborhood | | | Depth Factor | | |
| Area | | | Other Increments | | |
| Remarks | | | Decrements | | |
| BUILDING | | | Plottage | | |
| Size | | | Unit Lot Content | | |
| Height | | | Unit Lot Value | | |
| Area | | | Remarks | | |
| Cubic Content | | | | | |
| Stories | | | ANALYSIS OF STRUCTURAL VALUE | | |
| Type | | | Built | | |
| Class | | | Altered | | |
| Material | | | Additions | | |
| Condition | | | Reproduction Cost | $ | $ |
| Age | | | Depreciation | $ | $ |
| Tenancies | | | Replacement Value | $ | $ |
| Layout | $ | $ | Annual Depreciation Rate | % | % |
| Stores | $ | $ | Cubical Content | | |
| APPRAISALS | | | Reproduction Cost Per Cu. Ft. | | |
| Assessed Value | | | Replacement Value Per Cu. Ft. | | |
| Land | $ | $ | Remarks | | |
| Building | $ | $ | | | |
| Total | $ | $ | Dates, Hearings | | |
| Remarks | | | Viewing | | |
| | | | Tentative Decree | | |
| | | | Objections    Heard | | |
| | | | Final Decree    Passed Upon | | |

## CHART OF APPRAISAL ITEMS
### (continued)

### ANALYSIS OF ECONOMIC VALUE

| | City's Expert Year | Claimant's Expert Year | Actual Year |
|---|---|---|---|
| Potential Income | $ | $ | |
| Vacancies | $ | $ | |
| Collections | $ | $ | |
| Operating Expense | $ | $ | |
| Taxes | $ | $ | |
| Total Expenses | $ | $ | |
| Net Return | $ | $ | |
| Appraised Value | $ | $ | |
| % Return on Appraised Value | % | % | |
| Capitalization Rate | | | |
| Land | | | |
| Building | | | |
| Overall | | | |

### PARTIAL TAKING

| Dimensions | | | |
|---|---|---|---|
| Value of Whole Before Taking | $ | | |
| Value of Whole After Taking | $ | | |
| Value of Part Taken | $ | | |
| Consequential Damage | $ | | |

### ANALYSIS OF SALES

| | City | Claimant | Total |
|---|---|---|---|
| Number of Sales | | | |
| Total Selling Price | $ | $ | $ |
| Total Assessed Value | $ | $ | $ |
| Ratio | | | |

Note: If Damage Parcel Sold Recently Give Full Particulars

#### LAND

| | On City Val. | On Cl. Val |
|---|---|---|
| COURT'S VALUE | | |
| Number of Unit Lots | % | % |
| Unit Lot Value | | |
| Indicated Value | | |
| Value Land | | |

#### BUILDING

| Cubical Content | |
|---|---|
| Value Per Cubic Foot | |
| Value | $ |
| Value Building | $ |
| Total Value | $ |
| Remarks: | |

### FIXTURE TAKING

| City's Expert | Claimant's Expert |
|---|---|
| | |