Alexander Del Giobno, J.
The several requests to find and conclusions of law submitted by the claimants and the State marked by the court as found or refused are adopted by the court and shall be considered in conjunction with the memorandum-decision. Other requests are marked refused except as found for the reason that they may not be indicative of the court’s decision herein.
Tinnerholm’s claim is solely for the value of the permanent appropriation of an almost rectangular parcel of land located on the southwest corner of Conduit Boulevard or Sunrise Highway and Windsor Avenue, Rockville Centre. It had a frontage of 100 feet on Sunrise Highway and 130 feet on Windsor Avenue with a total area of 12,535 ± square feet. The claim of A M T S Diners, Inc., the lessee of Tinnerholm’s land but owner of the diner thereon, is for the permanent appropriation of the diner, the improvements inside, outside and surrounding said diner and for trade fixtures.
At the trial, the claimants moved that the claims be tried separately. The Attorney-General objected to separate trials and moved that the claims be tried together. The court granted the motion of the Attorney-General and ordered that the claims be tried together but that separate awards be made.
Properly to evaluate these claims, it is important that the relationship of the claimants to each other be understood, by reference to the documents offered in evidence.
Tinnerholm purchased the land on September 25, 1944 for $10,000, exclusive of the diner, which he had bought in 1941. The purchase was subject to a lease held by the said Tinnerholm, which lease was merged in the fee by the provisions of the conveyance.
Tinnerholm executed a lease to Bernack Diners, Inc. on July 7, 1953, running from July 1, 1953 to June 30, 1963. The lease was for the land only, but provided for payment of a chattel mortgage executed that day, by way of additional monthly rent. This chattel mortgage was on the diner, indicating a sale thereof to the lessee.
Bernack Diners, Inc., on June 9, 1954, sold its right, title and interest in the diner ‘1 inclusive of the dining car and the exten *313 sions and buildings annexed thereto, and inclusive of the chattels, fixtures and equipment therein, all being more specifically enumerated in the schedule annexed hereto and made a part hereof, and inclusive of the leasehold and good will of the said business ” to Angelí Starkis, Theodore Kaloudis and Michael G-lyptis for the sum of $14,000. The latter three also assumed the obligations under the lease above mentioned and acquired its rights and benefits.
On January 17, 1957, the same three, who had formed the claimant corporation, AMTS Diners, Inc., made a similar bill of sale to the said corporation. The sale was for $10 and other valuable consideration, but the schedule of the contents included the same items they had purchased from Bernack, less some 18 items out of a total of 81.
On January 17, 1957, AMTS received an assignment of the lease and also assumed all the obligations under the lease.
The lease was a Blumberg’s Improved Grilsey Form Lease. The 21st clause, which was printed, provided that in the event of condemnation, the lease would come to an end and that “ no part of any award, however, shall belong to the Tenant ”.
The 36th clause, which was typewritten, provided as follows: “It is expressly understood that the dining car and/or accessory buildings placed on the premises shall be considered personal property and not as part of the realty. At the end of the term or upon expiration date of this lease, the Tenant agrees to remove the diner and any accessory buildings and fill in the cellar excavation to the level of the remaining land and shall leave the entire premises free of foundation blocks and clear of refuse. ’ ’
The 39th clause, which also was typewritten, provided as follows : “ That in the event that said premises, or any part thereof, shall be taken and condemned for public uses by the proper authorities, then, the Tenant shall have no claim against the Landlord and shall not have any claim or right to claim, or be entitled to any portion of the amount that may be awarded as damages or paid as a result of such proceedings, except that the Tenant shall be entitled to any amount that may be awarded as damages or paid as a result of such proceedings by reason of the taking of any portion of any lunch car and/or accessory buildings or additions thereto which now are or hereafter may be erected and located upon or affixed to said lands and premises by the Tenant, its successors or assigns, and all rights to damages, if any, excepting those to such lunch car and/or accessory buildings or additions, are hereby assigned to landlord.”
*314 The 33rd clause of said lease gave the tenant the option to purchase the demised premises (the land) for $45,000, at any time prior to June 30, 1956, by written notice to the landlord. The option was to ‘1 stand cancelled ’ ’ if the tenant did not exercise said option by the specified date. The testimony showed that said option was never exercised.
At the trial Mr. Harry A. Schroeder, a licensed real estate broker and appraiser for 30 years, whose qualifications were conceded, testified for claimant Tinnerholm. He stated that this property was located at a very advantageous location on the Sunrise Highway about 100 feet west of Merrick Road, two of the most traveled highways on Long Island. It was zoned business A for the first 100 feet and residential for the rear, although it had been used completely for the business of the diner and parking for some 60 cars. The highest and best use was for such business purpose. He produced figures indicating that daily traffic had increased from 5,371 cars in 1952 to 6,856 cars in 1958, computed for the month of August from 10:00 a.m. to 6:00 p.m., and that the population had increased by one third in the surrounding area during the same period.
He claimed that conditions favoring the dining car business had become more favorable because of the traffic and population increase. He presented no list of comparable sales but stated that he was acquainted with values throughout Nassau County.
Both he and Mr. Myles Baker, State’s expert, agreed that the parcel was located in the older section of the town, nearby which were an auto wash, auto salesroom, nursery, incinerator and blacksmith shop, and that this section had remained static so far as resales of property were concerned. They agreed further that this dormant condition was caused by the promulgation of a plan of the State to improve those highways and to eliminate a railroad grade crossing, which plan, although never consummated by the State, had dissuaded owners of property from causing improvements thereon to be made.
Mr. Schroeder conceded that prior to the retainer his knowledge of this parcel was only casual. He disputed the alleged comparable sales produced by the State as not applicable, and gave as his opinion a unit value of $5 per square foot or a total of $62,675 for the land above. On redirect examination, he testified that he valued the property at $4 per square foot plus 25% for corner influence because this was business property. He explained that Windsor Avenue runs south of Sunrise Highway for three quarters of a mile and its junction with Sunrise Highway made the corner attractive.
*315 Augp.11 Starkis, president of A M T S Diners, Inc., testified that after they bought the diner he added a fruit cooler, lunch counter (2 sections) a Bain Marie, steam table, 2 stainless steel sinks, stainless steel shelves, an awning and repaired the neon sign outside of the diner.
He claimed that Mr. Irving Richter, a negotiator for the State, came to the premises in May, 1957 and made a list of those items which were removable and those that were fixtures. Starkis removed the movable and, at the auction sale held by the contractor, bought the remainder.
In March, 1957, after the vesting date, there was a small fire in the roof of the diner for which AMTS received from its insurer the sum of $1,600 which shall be deducted from any award.
He stated that the diner is located at the westerly end of Rockville Centre, which has a population of 25,000, and that they made a profit from the business. He conceded that at the time the diner was 24 years old and the extension thereto was 10 years old. He agreed that it was an old-fashioned diner, and that 1,000 feet east there was a modern diner.
Michael Grlyptis, another partner, testified along the same lines as Starkis. He added that the items left behind were either affixed to the building or cut specially for the space occupied. Of the fixtures they bought at the auction sale, some they used, others they gave away. He stated that when they bought the diner it was old. They repaired and extended it and made it up-to-date.
The AMTS accountant said that the three partners worked 24 hours a day which helped to make the business pay.
Jay M. Spinner, a professional engineer and appraiser, submitted an appraisal of the diner. He presented the measurements of the diner and, although he had not bought or sold diners, he stated that in his opinion in February, 1957 a diner, which was new and modern, Avould cost $1,000 a linear front foot. As to this diner, he gave a 2% yearly depreciation for 50 years because, in his opinion, it needed no outside maintenance, except the roof. Thus, he asserted, the building lost no value on the basis of depreciation, nor for obsolescence since it was a specialty, even though its style was out of date. He asserted that age did not matter because it was a good location and did a good business.
He conceded that the entire structure could have been removed. He also conceded that he employed direct depreciation because he did not understand functional or economic depreciation.
*316 The measurements of the diner are approximately 53 feet front and rear by 36 feet on the sides except that on the front the building is 35 feet long, then the line goes back 12 feet towards the rear and again across to the westerly extremity about 17% feet and again to rear for 24.6 feet.
Mr. Spinner set the replacement cost of the structure and the paving on the plot at $49,200, less a depreciation of $16,320, which leaves $32,880 as the value of these objects on the date of taldng.
He stated that if the diner were removed there necessarily would remain with the land:
Paving ..................... $2,850
Excavation................. 1,975
Cellar floor................. 400
Chimney ................... 100
Brick stoop................. 650
Plumbing and sewer......... 500
$6,475.
If there had been no lease agreement defining these items as personalty, as between landlord and tenant, then they would be allocated to the land rather than to the diner. Since the parties have chosen to treat them as personalty, they will be so considered as part of the final evaluation of the diner and allocation of interest to the tenant.
Mr. William Zanos, an expert on buying, selling and installing restaurant and store fixtures, stated that he had examined the diner and contents, that the fixtures in a list he submitted were either custom built to fit the diner or so affixed to the premises that their removal would have damaged them seriously. Cross-examination brought out, however, that one month before Mr. Richter came to the premises, Mr. Zanos had sent a letter to Mr. Wesley, claimant’s attorney, specifying what he considered fixtures and what he considered removables, thus indicating claimant’s preconceived notion of the classification of these items on the day Mr. Richter came to the premises and a confirmation of Mr. Richter’s testimony that he followed claimant’s suggestions regarding designation of the fixtures. Some of Mr. Zanos’ testimony indicated that some items could be removed, but with difficulty. He gave it as his opinion that the present market value of the fixtures, set out in claimant’s Exhibit 25, was $6,600, whereas at auction they would bring in only 10% of the value. Mr. Zanos stated that in the trade a *317 diner is written off in 10 years, although it would have functional value.
For the State, Sidney Eichter, who is an attorney and the senior land claim adjuster for the past 10 years for the Department of Public Works, stated that he met with the claimants and their attorney, as previously testified, at their request, to find out what they wanted to retain. The lists were made on that basis, the State desiring to be of help to them. The lists he made were marked in evidence. He did state that there were doubts among them all including himself as to whether certain items were fixtures.
Mr. Myles Baker, a licensed real estate broker and appraiser since 1919, testified for the State. His qualifications were conceded. Nevertheless, the State spread on the record his qualifications consisting of three sheets. He testified that he examined the subject matter on May 17, 1957. He found only three sales with some relevancy to the subject property.
He said he was not affected in his opinion by the alleged com-parables he presented, although some were valued at $1 a foot. He appraised the subject parcel at $2 a square foot plus a corner value of 10%. Thus, he valued the land at $25,000 plus 10% or $2,500 — total value of land $27,500. He explained that although corner influence may amount to as much as 50%, he gave only 10% because Windsor Avenue is a side street which was never acquired by the village and ‘ ‘ goes nowhere ’ ’. However, he conceded Windsor Street was paved, that ibis was a true corner and that Sunrise Highway is a main East-West highway on Long Island. To the court it seemed that Windsor Avenue, extending for three quarters of a mile, went somewhere, and deserved more favorable consideration.
Mr. Baker said that he had appraised, bought and sold some 50 or 60 diners. He did not have at hand the size specifications of the subject diner.
In valuing the diner, he considered the land and building as a unit. He gave the whole a valuation of $48,300 and, deducting the $27,500 for the land, he found the value of the diner and its contents to be $20,800. He gave no value to the lease on the ground that, since the tenant had the privilege of removing the diner at the end of the lease, the diner would be of no value when removed. He stated that the lease was valuable to the owner and not to the tenant, since the latter’s value was restricted to the terms of the lease.
With reference to the $45,000 option contained in the lease, both experts agreed it was for land only. Both conceded there was a willing buyer and a willing seller. They concluded this *318 was at the rate of $3.60 per square foot, but Mr. Baker said he was little influenced by it since it had never been exercised by the tenant. Mr. Schroeder, on the other hand, said he considered it as one of the determining factors. He believed too, that between July, 1953 and February, 1957 values had increased 40%. While he was unable to show such increases by any sales made on record, he claimed they were general in Nassau County.
At the end of the case, the State moved for judgment dismissing the claim of claimant AMTS while the claimants moved for judgments on their proof. Decision on all motions was reserved.
In reaching a decision upon this somewhat confusing but nevertheless definite state of facts, we should first have recourse to fundamental principles applicable to appropriations so far as they will help to clarify the rights and obligations of the parties hereto.
The State is endowed with the right of eminent domain as a prerogative of its very existence. Through the exercise of this right the State may appropriate private property for public use. It must, however, fairly compensate the owner thereof for what was taken and also for any consequential damages flowing therefrom. (N. Y. Const., art. I, § 7, subd. [a]; U. S. Const., 5th Amdt.; 14th Amdt.; Matter of City of New York [Cross-Bronx Expressway], 195 Misc. 842.)
An appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures. (Jackson v. State of New York, 213 N. Y. 34.)
The settled law is that an award must be made to the tenant for fixtures or structures annexed to the real property, though these are the personal property of the tenant, whenever the leasehold is destroyed by the taking. (Matter of Willcox, 165 App. Div. 197.) The State takes the real property condemned as it then exists. (Matter of City of New York [Allen St.], 256 N. Y. 236.) In that case the lessee had the right to remove the fixtures at the expiration of the lease, which provided for termination in the event of condemnation. The court recognized that the only problem involved was whether the tenant’s fixtures were real property. It proceeded upon the assumption, based upon a stipulation filed by the litigants, that “the ‘fixtures’ were so annexed to the real property that, while by agreement between the landlord and tenant they remained the personal property of the tenant, they would have become part of the real property if they had been installed permanently by the owner of the fee ” (p. 240).
*319 Thus, if the agreement between landlord and tenant were to be disregarded and the condemnation conceived of as the taking of an undivided fee, the fixtures would be considered real property. The court held that the city must pay for the real property appropriated regardless of the subdivision of interest and of the lease between landlord and tenant, and said, at page 249: “ The city must pay the value of what it takes. To the extent that the value of the real property as a whole is enhanced by the fixtures annexed thereto, the value of the fixtures must be included in what the city pays, and the tenant is entitled to part of the award, not because the fixtures added to the value of the leasehold, but because they belonged to him and their value enters into the value of what the city has taken.” At page 242 the court stated: “ In fixing awards in condemnation proceedings, the value of what has been taken must be determined and then that value must be divided among those whose interests are extinguished by the taking. Those interests may be defined by contract of the parties interested ”; and at page 243, citing Matter of Mayor of City of N. Y. (168 N. Y. 254) and Poillon v. Gerry (179 N. Y. 14), the court continued: “ The tenant retains the right to compensation for his interest in any annexations to the real property which but for the fact that the real property has been taken, he would have had the right to remove at the end of his lease.”
Where the rule is applicable, the paramount questions to be determined are the value of the parcel taken and of the improvements thereon as if there were one owner, and whether the improvements are personalty or realty. In the case of Matter of City of New York (Allen St.) (supra, p. 245) Judge Lehman laid down the rule to be applied where owner and tenant are joint claimants against the sovereign thus: “ What may constitute personal property where the contest is between landlord and tenant may be real property where the claimants stand in other relation. The nature of the structure or fixture and the mode of its annexation may be the decisive factor in some cases; not in all. ’ ’
In the present case we find, in addition to the contracts mentioned, (1) the demand by Tinnerholm at the trial that he be given an award only for the land, as if no structures were thereon, (2) the assertion by A M T S that it agrees with Tinnerholm that A M T S is entitled only to an award for the diner and its appurtenances inside, outside and surrounding the diner, including the black top over the land and the foundation of the diner and (3) the contention of the State that the diner is personalty and, therefore, not compensable.
*320 The court viewed the location of the property but it is now part of the great road improvement, and all vestiges of its former status, therefore, have disappeared. A sufficient number of photographs were introduced into evidence, however, to enable the court to understand its condition on the vesting date.
The diner and its extension, for the most part, rested upon a solid concrete foundation or footing. It was, indeed a very old-fashioned diner, not even resembling the modern diners one finds on the roadways; it was of frame construction with sheet metal covering. There was no uniformity in its architecture. Nevertheless, it appears to have been neat, clean and not uninviting. It was in keeping with its immediate surroundings. Age was written all over it. The experts conceded that the diner was removable with attendant difficulties.
In front of the diner there were a large upright neon sign on a pole which was imbedded in the ground and another small sign east of the diner.
Were these personalty? The answer is no. The fact that paragraph 36 of the lease defines the diner as personalty as between landlord and tenant does not make it personalty as against the State. This definition must be read in the context of that clause which indicates to me the paramount desire of the landlord to have his land clear at the end of the lease, and of the tenant to retain its diner for its probable use, perhaps, somewhere else. The tenant testified that after the vesting date it could find only a smaller plot quite a distance from there and that the diner would not fit upon it. That, however, is not controlling. What was important here was that the State which asks no question nor is required to do so, came into this property, as was its right, and took it all. It took the land and structures as it found them, with the knowledge of its liability to pay fair compensation for all it found there, and with complete indifference to the division of interest therein. If the structure had been one of a different type from that of a diner, as, for example, a taxpayer’s unit, the position of the State could be no different. Indeed, I find that the mode of annexation of the diner and its extension to the land was no different than the annexation of the average taxpayer building to the land.
Under these circumstances, was the tenant required to remove the diner? We think not. It is a fundamental canon of construction that a contract must be read as a whole in order to determine its purpose and intent, and that single clauses cannot be construed by taking them out of their context and giving *321 them an interpretation apart from the contract of which they are a part. (Eighth Ave. Coach Corp. v. City of New York, 286 N. Y. 84, 88-89, citing Atwater & Co. v. Panama R. R. Co., 246 N. Y. 519, and Becker v. Frasse & Co., 255 N. Y. 10.)
“ Words considered in isolation may have many and diverse meanings. In a written document the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document, all based upon the situation and circumstances existing at its creation.” (Eighth Ave. Coach Corp. v. City of New York, supra, p. 89.)
The lease meant only that if the tenant had left the diner there, it would have been forfeited to the owner; if the tenant removed it, then it was required to eliminate the foundation and level off the land. (Matter of City of New York [Allen St.], supra.)
The court, therefore, considers the taking as an entire unit and finds that the value of the land, structures and appurtenances on the date of taking was as follows:
Land 12,535 square feet at $2.50 per square
foot .................................. $31,237.50
For corner advantage — 20%............. 6,245.50
$37,483.00
Diner .................................. 22,000.00
Fixtures................................ 4,500.00
Total award ........................ $63,983.00.
A word of explanation regarding the award for the alleged trade fixtures which were claimed as part of the diner claim is necessary. Mr. Zanos testified on behalf of A M T S that the air-conditioning unit was removable with some difficulty, and that if removed it would be workable and worth $1,000. Additionally, in my judgment, other items, such as gas ranges and soda fountain compressor and cooling unit were easily detachable ; and this must be taken into consideration. The fact that the tenant purchased all the fixtures at the auction sale conducted by the contractor is also a matter, perhaps of not too much import, but worthy of consideration in arriving at a total award.
The court has considered also the provision in the lease giving the tenant the option to purchase the land for the sum of $45,000. Considering the fact that it was not exercised, in addition to the other evidence submitted, the court concludes that this *322 option was not the primary consideration for the lease. It was, rather, a protection, speculative in nature, sought by the tenant to be availed of in the event that the volume of business or other extraneous reasons dictated the purchase as sound policy. Thus, the court did not accept it as a true sale, but only as an item to be considered in conjunction with all other evidence before the court, in arriving at valuations.
The court considered also the price paid for the diner by the tenants, but could not, as the State indicated, consider it as restrictive of additional testimony presented as to the value of the diner on the vesting date. There were too many speculative elements present in that situation as well. As an example, the sale may have been made at a sacrifice at a time when business was bad; it may have been made at a time when the proprietors or any of them were ill or were considering retirement, or indeed for any other reasons, not necessarily pertinent here.
The court accordingly makes an award of $63,983, apportioned as follows: to Carl GL Tinnerholm for the land only, $37,483, with interest from February 14, 1957; to A M T S Diners, Inc., for the diner and its appurtenances and trade fixtures, $26,500, from which there shall be deducted the sum of $1,600 received by A M T S Diners, Inc., leaving a balance of $24,900, with interest from February 14, 1957.
Let judgment be entered accordingly.