SCOTT LUMBER COMPANY, Inc., Appellant,

v.

UNITED STATES of America, Appellee.

No. 20993.

United States Court of Appeals Ninth Circuit.

Feb. 1, 1968.

Rehearing Denied March 11, 1968.

Henry Gifford Hardy (argued), San Francisco, Cal.; Alfred B. McKenzie, Carmichael, Cal., William E. Rollow, Washington, D. C., for appellant.

Edwin L. Weisl, Jr., Asst. Atty. Gen., John P. Hyland, U. S. Atty., Sacramento, Cal., S. Billingsley Hill (argued), Roger P. Marquis, Attys., Dept. of Justice, Washington, D. C., Charles R. Renda, Asst. U. S. Atty., Lands Division, San Francisco, Cal., for appellee.

Before JERTBERG and DUNIWAY, Circuit Judges, and WEIGEL, District Judge.

JERTBERG, Circuit Judge:

This appeal arises from a condemnation proceeding instituted by the United States, on behalf of the United States Forest Service, seeking to acquire an estate in timber land belonging to appellant, Scott Lumber Company, Inc., consisting of "easements for highways in all existing roads and all timber thereon, subject to easements for existing public utilities, if any, and in case of permanent abandonment of said right-of-way by plaintiff, the title and interest therein taken shall end, cease and determine, and title shall revert to the then owner of the underlying interests in said right-of-way." The use for which the property is to be taken is "for the construction, maintenance and permanent use of highways for the purpose of removing timber and other products from the Shasta-Trinity National Forest, and for the use, conservation and protection and general administration of said forests, and for all other lawful purposes."

The United States filed a declaration of taking at the time of the filing of the complaint on May 18, 1960, and deposited in the court an estimated just compensation. On the same day the district court entered an order for delivery of possession.

The litigation then proceeded in two phases. The first phase was heard by the district judge, sitting without a jury, and related to the necessity and authority of the United States to condemn the estate sought in the complaint. The second phase related to the jury trial on the issue of just compensation.

## THE FIRST PHASE OF THE LITIGATION

By answer filed, the appellant claimed an interest as owner in fee simple of the estate condemned; denied that the proceedings were instituted under the power of eminent domain; and denied any statutory authority for the taking. The answer further alleged that the taking was not for a public purpose but was for the purpose of benefitting certain competitors of appellant pursuant to an illegal agreement between the United States and such alleged competitors.

Thereafter, appellant moved the district court to vacate the order of delivery of possession on the grounds that the taking was for a private purpose and that the compensation deposited was grossly inadequate. In response the United States moved the district court for an order determining a preliminary legal question, urging the court to rule that the taking was within the legislative authority set forth in the complaint and declaration of taking. Numerous affidavits were filed by the parties in support of and in opposition to the motions. Upon consideration of the depositions, affidavits, and legal memoranda, the district court denied the motion of appellant to vacate the order of delivery of possession and granted the motion of the United States for a determination that the taking was for a public purpose.

Thereafter the district court, deeming the government's motion for an order determining a preliminary legal question as one for summary judgment pursuant to Rule 12(c) Federal Rules of Civil Procedure, entered a summary judgment holding:

"that the estate and interest condemned by plaintiff herein is one authorized by law and that the purpose and use of the property condemned, as stated in plaintiff's Complaint and Declaration of taking is a public one."

Appellant contends that the district court erred in entering the summary judgment "because there was no showing whatever by the government that there was no genuine issue as to material facts, or that the government was entitled to the judgment as a matter of law."

The easements condemned aggregated approximately twenty-three and one-half acres and embraced existing timber hauling roads across the section of land [Section 31] owned by appellant, and extended for a short distance on each side of the roads. The existing roads varied in width from nine to sixteen feet and the additional strips condemned on

each side of those roads were for widening the roads up to twenty-six feet in width and for appropriate safety zones. The immediate area involved, in general, was owned (alternately by sections) by the United States and private interests. As above noted, the use for which the property was taken was for the construction, maintenance and use of highways "for the purpose of removing timber and other products from the Shasta-Trinity National Forest, and for the use, conservation and protection and general administration of said forests, and for all other lawful purposes."

An Assistant or Acting Secretary of the Department of Agriculture, who in that capacity signed the declaration of taking and requested the institution of the condemnation proceedings, testified by deposition that:

"The road will be used for all the administrative uses of the national forest properties which it is intended to serve, which includes all the purposes. Timber is one of the dominant uses. * * * the principal purpose of the taking was for the administration of the national forest lands in the immediate area to be serviced by this road, including all purposes for which those lands are publicly managed. * * *."

It appears abundantly from the record that among other uses the road will furnish access to timber lands of the United States, and thus enable the transportation of timber harvested thereon to be transported to the lumber mills of purchasers from the United States.

■ We are completely satisfied that the taking was for a public use and that such taking was authorized by law. See Act of August 1, 1888, 25 Stat. 357, 40 U.S.C. § 257; Act of June 4, 1897, 30 Stat. 34–36, 16 U.S.C. §§ 475 and 476; Act of August 27, 1958, 72 Stat. 885, 906–907, 23 U.S.C. §§ 203 and 205; Act of June 23, 1959, 73 Stat. 92, 103–105.

Appellant's contentions that there was no necessity for the taking; that the taking was in excess of the needs of the government; and that competitors would be benefitted by the taking, do not create genuine issues as to material facts and thereby permit judicial review of the administrative decision. See: Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L. Ed. 209 (1946); Southern Pacific Land Co. v. United States, 367 F.2d 161 (9th Cir. 1966), cert. denied 386 U.S. 1030, 87 S.Ct. 1478, 18 L.Ed.2d 592 (1967); United States v. State of Montana, 134 F.2d 194 (9th Cir. 1942), cert. denied 319 U.S. 772, 63 S.Ct. 1438, 87 L.Ed. 1720 (1942).

Appellant further contends that the administrative decision was arbitrary, capricious and made in bad faith. As stated in *Southern Pacific Land Co.*, supra, 367 F.2d at p. 162:

"And various courts of appeal, including this one, have said that an exception to judicial non-reviewability exists in such circumstances. [Citations omitted]."

■ In the instant case the district court in its memorandum and order stated:

"This Court need not, and will not, stand idly by and allow administrative officials to take private property arbitrarily, capriciously, in bad faith, or for what is essentially a private purpose (Simmonds v. United States, 199 F.2d 305; United States v. 1096.84 Acres in Marion Co. [D.C.], 99 F.Supp. 544). Scott has, however, failed to bring this case within this established rule. The facts alleged by Scott, taken in the light most favorable to Scott, do not show that the action of the officials has such an arbitrary, capricious, or bad faith quality as to justify interference by this Court."

Assuming, without deciding, that a limited power of review of an administrative decision exists where it is contended that the administrative decision was arbitrary, capricious, or made in bad faith, we agree with the statement of the district court that:

"The facts alleged by Scott, taken in the light most favorable to Scott, do

not show that the action of the officials has such an arbitrary, capricious or bad faith quality as to justify interference by this Court."

The district court did not err in refusing to submit this issue to the jury for its determination, as appellant contends. Rule 71A(h) governing federal condemnation trials, after providing for trial by jury or commission of the issue of "just compensation", states: "Trial of all issues shall otherwise be by the court." Cf. United States v. 91.69 Acres of Land, More or Less, in Oconee County, 334 F.2d 229 (4th Cir. 1964).

■ We affirm the summary judgment granted by the district court that the taking was for a public purpose and that the administrative decision was not arbitrary, capricious, or made in bad faith.

## THE SECOND PHASE OF THE LITIGATION

The jury found that just compensation "for the estate and interests of defendant Scott Lumber Company, Inc., condemned in this action, excluding the value of timber located upon the right-of-way condemned, is the sum of $691.00." Thereafter final judgment of condemnation was entered and appellant's motion for new trial was denied.

In order to place in proper focus what we consider to be a crucial contention of appellant on this appeal, it is necessary to review broadly certain events leading up to the return of the jury verdict.

The jury trial was lengthy, commencing on December 1, and ending on December 17, 1964. The reporter's transcript consists of thirteen volumes, aggregating 1708 typewritten pages. Subsequent to the entry of a pretrial order the cause proceeded to trial before a jury. Included in the pretrial order appear the following:

"I

"FACTS

"The following facts have either been accepted without objection or have been stipulated to by the parties as substantially true and correct:

"(1) * * *

"(2) That at the time of taking the land involved was owned in fee simple by defendant Scott Lumber Company, Inc., subject, however, to certain easements and rights of way vested in defendants R. G. Watt and Alice McCourt Lamm, individually and as trustee of Trust 'B' of the estate of W. E. Lamm, deceased.

"(3) * * *

"(4) Defendant Scott Lumber Company, Inc., and plaintiff have stipulated that the fair market value of the timber condemned herein is $21,809.00 as of May 18, 1960. By virtue of said stipulation this issue has been removed from the matters to be determined by the jury and shall be included as part of the Final Judgment to be entered at the termination of this matter.

"II

"JURY ISSUE

"The only issue remaining to be determined by the jury in this proceeding is to ascertain the amount of just compensation to be awarded for the taking herein, exclusive of any value for timber thereon.

"III

"TRIAL PROCEDURE

"The following rules of the Court shall govern the procedures indicated:

"(1) The measure of just compensation shall be the usual 'before and after' rule of market value of the property concerned as of May 18, 1960.

"(2) No more than two expert valuation witnesses shall be permitted to testify on behalf of either party.

"(3) * * *.

"(4) * * *."

Appellant offered the valuation testimony of two witnesses, Sanders and Wall. The testimony of Sanders was lengthy, covering 352 typewritten pages. This witness expressed the opinion that the fair market value of Section 31 before

the imposition of the easement was $841,-796, and that the fair market value of the section after the imposition of the easement was $653,104, and that the difference between the two figures, or $188,692, represented the fair market value of the estate taken, which last figure included the stipulated value of the timber growing on the easement in the amount of $21,809.

These valuation figures were stricken from the record and the jury was admonished to disregard them on the ground that the witness had not qualified himself to express such opinions. Later the witness was permitted to express valuation figures with respect to the fair market value of the merchantable timber on Section 31 before and after the taking. His figures were $675,000 prior to the taking and $507,700, after. Later the district court struck these valuation figures from the record and admonished the jury to disregard them, as hereinafter set forth.

The testimony of Wall was also lengthy, covering 305 typewritten pages. This witness expressed the opinion that the fair market value of Section 31 before the imposition of the easement was $775,000, and that the fair market value of the section after the imposition of the easement was $625,000, and that the difference between the two figures, or $150,000, represented the fair market value of the estate taken, which last figure included the stipulated value of the timber growing on the easement in the amount of $21,809.00. The witness also expressed valuation figures as to the fair market value of the merchantable timber on Section 31, both before and after the taking. Later all valuation figures testified to by the witness were stricken and the jury was admonished to disregard them, as hereinafter set forth.

Both witnesses expressed the opinion that the highest and best use of the property, both before and after the taking, was for the growth, production, management, harvest, and sale of commercial timber.

The government offered evaluation testimony of two witnesses, Linville and Howell. Section 31 was described as being wooded with a heavy, mature growth of commercial timber of various species, such as pine, ponderosa pine, sugar pine, white fir, douglas fir and cedar. Both witnesses expressed the opinion that the highest and most profitable use of Section 31, both before and after the taking, was the immediate harvest of the timber thereon.

Amplifying his understanding of the meaning of the term "immediate harvest," we set forth, in Appendix A of this opinion, excerpts from the testimony of witness Howell.

Amplifying his understanding of the meaning of the term "immediate harvest," we set forth, in Appendix B of this opinion, excerpts from the testimony of witness Linville.

Howell expressed the opinion that the fair market value of Section 31, before the imposition of the easement, was $844,500, and that the fair market value of the section after the imposition of the easement was $822,000, and that the difference between the two figures, or $22,500, represented the fair market value of the estate taken, from which figure should be deducted the stipulated value of the timber in the amount of $21,809.00.

Linville expressed the opinion that the fair market value of Section 31, before the imposition of easement, was $800,000, and that the fair market value of the section after the imposition of the easement was $777,600, and that the difference between the two figures, or $22,400, represented the fair market value of the estate taken, from which figure should be deducted the stipulated value of the timber in the amount of $21,809.00.

The jury returned an award of $691.00 which gave total compensation in the sum of $22,500.00 [$691.00 plus $21,809.00].

After both parties had completed the presentation of testimony and had rested, and after the holding of the conference on the giving or refusing of jury instructions requested by both sides, and imme-

diately prior to instructing the jury, the district court, on motion of the government and over objections of the appellant, withdrew from consideration by the jury, on various grounds, all evaluation figures testified to by Sanders and Wall, appellant's evaluation witnesses, and admonished the jury to disregard such testimony. We set forth in Appendix C of this opinion the statement made by the district court to the jury in this respect.

The appellant moved to strike a portion of the evaluation figures testified to by the government witness, Howell, on the ground that he was not sufficiently qualified as an expert to express an opinion on such matters. The motion was denied.

The effect of the Court's statement was to restrict the jury in its deliberations to the evaluation figures testified to by Howell and Linville.

Since we are convinced, for reasons hereinafter set forth, that the district court erred in denying appellant's motion for new trial on the issue of just compensation, we deem it unnecessary to pass upon the propriety of the district court's statement set forth in Appendix C. For the same reason, we deem it unnecessary to pass upon other alleged errors appearing in appellant's specification of errors, since, in our view, it is unlikely that they will recur on a new trial.

Following the return of the jury verdict, appellant moved the district court for an order granting appellant a new trial on the issue of just compensation, on the grounds, among others, that the verdict was not supported by legally sufficient evidence.

From our review of the entire record, we have reached the conclusion that the ends of justice require a new trial on the issue of just compensation because the jury award is not supported by legally sufficient evidence.

As stated in Olson v. United States, 292 U.S. 246, at page 254, 54 S.Ct. 704, at page 708, 78 L.Ed. 1236 (1934):

"The judicial ascertainment of the amount that shall be paid to the owner of private property taken for public use through exertion of the sovereign power of eminent domain is always a matter of importance for, as said in Monongahela Navigation Co. v. United States, 148 U.S. 312, 324 [,13 S.Ct. 622, 625, 37 L.Ed. 463]: 'In any society the fullness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government.' "

The record is clear that the evaluation figures of Howell and Linville, as to the fair market value of the estate taken, were based upon their conception of the highest and most profitable use of Section 31, both before and after the taking, as being for the immediate harvest of the timber thereon. Appendices A and B convince us, and we believe the jury, that "immediate harvest" meant to them the immediate cutting of all timber on the section, leaving only stump land. Such method is contrary to the public policy and laws of the State of California, and contrary to the Forest Practice Rules and Regulations of the Forest District of the State of California in which Section 31 is located. See Division 4, Chapt. 10, of the Public Resources Code of the State of California, entitled "Forest Practices", §§ 4901 et seq., and 14 Cal.Adm.Code §§ 921, 923 and 923.1.

Responding to appellant's assertion in its opening brief that Howell and Linville, the government evaluation witnesses, based their opinion of the fair market value of the estate taken on "cut out and get out" timber harvesting, in violation of the California Forest Practice Act, the government replies in its brief:

"Appellant implies from this term that the Government's witnesses were suggesting that the purchase of this property should 'clear cut' the timber. 'Clear cutting' means to cut the timber indiscriminately without reference to its size or merchantability. This prac-

tice is in violation of the California Forest Practice Act."

The government concedes that its witnesses "appraised the property on the basis of a 'full cut' or immediate harvest, and asserts that it was their opinion that the 'highest and most profitable use' of the property—the use which gave it the greatest value in the market—was the purchase for immediate harvest of the merchantable timber." Our appraisal of the record is to the contrary. Our study of the record compels the belief that the opinion of Howell and Linville as to the highest and best use of the property—the use which gave it the greatest value in the market—was for "clear cutting" of the timber on Section 31, and that both of said witnesses based their opinions of the fair market value of the estate taken upon an illegal and impermissible use.

In Graves v. United States, 62 F.Supp. 231 (D.C.N.Y.1945), the federal government condemned bronze castings owned by private parties. Federal regulations restricted the use of copper and the federal government established a copper recovery program. The court concluded that the market value for bronze castings at the date of the taking had been limited, by lawful use restrictions imposed by the War Production Board and by lawful maximum price regulations for scrap fixed by the Office of Price Administration.

In Gear v. City of Phoenix, 93 Ariz. 260, 379 P.2d 972 (1963), the City of Phoenix condemned a portion of the defendant's property abutting on a street. Prior to condemnation a valid city ordinance restricted the parking of automobiles on defendant's property to four cars. In violation of the ordinance, the owner had parked six cars on his property. Following the taking of a portion of defendant's property, there remained space under the terms of the city ordinance for the parking of only two cars. The defendant claimed compensation for loss of four parking spaces. The city contended that the defendant was entitled to compensation for only two spaces.

The court held in favor of the city, stating at page 974 of 379 P.2d:

"\* \* \* the availability of land for a use which is prohibited by law cannot be considered in determining its value in eminent domain proceedings."

Since all evaluation figures testified to by appellant's evaluation witnesses were stricken from the record, and since the opinions expressed by the government evaluation witnesses as to fair market value of the estate taken were based on an impermissible use, the jury award is not supported by legally sufficient evidence.

We do not say that the federal government, in its management, harvesting and sale of the timber on forest lands in California belonging to it, is subject to the provisions of the California Forest Practice Act. What we do say is that in appraising privately owned forest land in California, to determine the fair market value of an estate therein sought to be condemned, evaluation witnesses must determine the highest and best use of the land in a manner that is not violative of the Forest Practice Act of the State of California.

As stated by the district court in one of his instructions to the jury:

"In determining the fair cash market value of the property sought to be condemned, you will not permit yourselves to be in any way influenced by the character of the Plaintiff as the United States of America nor by the fact that the property was taken for a public purpose. You will, in determining the amounts to be paid by the Plaintiff to the Defendants as compensation for the taking of their property proceed in precisely the same spirit of fairness that you would exercise if you were sitting as finders of fact to determine the value of such property between owners who were willing to sell and a private purchaser who was willing to buy, where such parties had agreed that such property should be sold at a fair cash market value, and had submitted to you, as finders of

fact, the question of determining what the fair cash market value was."

Clearly, in such a situation the parties would have arrived at the fair market value of the property based upon the highest and best use of the property consistent with the provisions of the Forest Practice Act of the State of California.

The judgment entered below on this phase of the litigation is reversed, and the cause remanded to the district court with instructions to grant appellant a new trial.

## APPENDIX A

Mr. Howell testified:

" * * *, and so the highest and best use of this property from all of the information that I could gather of a single section of land that was owned by Scott Lumber Company was for the immediate harvest of the timber that was on that property. Now, this isn't to say that Scott Lumber Company, or any other buyer in the market, wouldn't have the right to continue to manage that property and hold it for later harvest and harvest over a period of years, and so forth. That would be their prerogative but they would have to meet the valuation based upon, that is, in selling the price, the valuation were to be based upon immediate harvest."

"Then I also had the sales that were used by Mr. Bunting and others representing the United States Government, sales of timberland, or not of timberland, but of timber itself. These assisted me to estimate the market price that this property would be sold for, that is, the cut over timber land value, and considering what these had sold for, and applying the same to this section, considering its location, its condition in the before situation with the owner road through the property, with another special service road through the lower portion of the property—that would be the one involving Parcels 2 and 3—

Q Mr. Howell, let's see if we can speed this up for a moment. In connection with the before situation, I think you have already described its physical condition as you found it, and have you described, sir, the access, as you found it, between Section 31 and Five Corners?

A I don't believe I have.

Q Would you tell us what your understanding of it was and the basis of your investigation?

A There is a road—there was a road as of 1960 which Scott Lumber Company had access over for a period, of, well, for various periods of time, but it was by renewable permits, that is, it would be necessary for them, at the expiration of each permit time, to again obtain new permits. This would be one of the conditions that a buyer would have found that here is a property without any legal access except for a short period of time.

Q Would that have been given serious consideration, in your opinion, by a purchaser?

A Yes, it would. I think that if the purchaser planned on marketing the crops or harvesting the crop immediately this would not pose any particular problem, but if it were to be managed property, one which would take a period of time, I believe that a purchaser would have expected some legal rights to transfer this road across several different ownerships and he would have asked that this be supplied him before he would have purchased the property."

\* \* \* \* \* \*

" * * *, the highest and most profitable use of the property in the after situation would be for the immediate harvest of the timber that is on this section."

\* \* \* \* \* \*

" * * *, my appraisal was based upon the harvest of Section 31 immediately upon purchase as of *June 18, 1961.*"

"These roads and landings might not be utilized too much by a buyer. He might disagree with that system. He might want to harvest the whole thing at one time or go into it to harvest it and those landings and the existing road that went through, I think that that would have been taken into consideration which I did in valuing the property."

\*     \*     \*     \*     \*     \*

"Well, that's entirely up to the individual buyer. If he wants to utilize the timber and harvest it over a period of years, possibly these roads and skid trails might be of some benefit to him, but he still will have to purchase that property on the basis of a man who was going in and harvest it now because that is the most highest and most profitable use of the property."

"A buyer in the market who is going to continue to manage the property might have got some particular use of these landings and these skid trails, but it is rather questionable to me if you were going to harvest this timber all at one time, as I feel its highest and most profitable use would be, whether these landings and skid trails would ever be of any particular value to a buyer."

"So I would say that it was not a logical thing that someone would buy this timber to manage it. The highest and best and most profitable use would be for the harvest of it as immediately."

\*     \*     \*     \*     \*     \*

"A purchaser of this property, in my mind, would have been interested in that timber, timber to sell off and harvest."

\*     \*     \*     \*     \*     \*

"Q  Now, when you say immediate harvesting, Mr. Howell, what do you mean by 'immediate', a day a week?

"A  Oh, I would say in a year, possibly. It depends upon what time of the year they purchased the property. For instance if they purchased this property in the fall, why, it is unlikely they would get very much in the way of logging done that year. They would

have to wait until the next Spring when the timber could go out possibly in the next twelve weeks. They could harvest possibly all of that in the summer time. So it might take two years to really remove the timber from the property.

There is one sale, I believe, of some 25 million up at Red Mountain that was all harvested in one season. I think it could be done with this, too.

"Q  Well, doesn't the fact that it might take from a year to two years limit the type of purchaser who might buy Section 31?

"A  No, I don't think it would limit it. It would still be the person who wanted to harvest it as soon as he possibly could, or it could be a buyer who wanted to manage it, and in that case he might take several years, but he would have to pay the price that the man who is willing to harvest it right now was willing to pay for it.

"Q  Wouldn't it require a purchaser with substantial resources to do this?

"A  Yes, it would, but I believe that anyone who is going to have—and it would be up to the seller to decide if he would accept a bid from a person. Just as the Forestry when they accept a bid for the sale of timber the bidder has to show he has the ability financially to pay for that timber.

I think the same thing would be expected, and in my arriving at this value I contemplated that they would find a buyer who had substantial resources."

APPENDIX B

Mr. Linville testified:

"Q  \*  \*  \*.  Well, on the basis, then, of your investigation, your knowledge, and the facts upon which you relied, did you arrive at a conclusion as to the highest and best use of this section as of May 18, 1960, prior to the imposition of the Government Road?

"A  Yes, I did.

"Q  What was that, sir?

"A  \*  \*  \*, and I concluded that as of May 18, 1960, the highest and

best use of this property, that is, the use which would being (sic) the highest price if it was offered for sale on the open market under the terms of fair market definition would be to sell it to someone who would cut the timber off as quick as they could."

\* \* \* \* \* \*

"Q Did you, sir, come to a conclusion with respect to the highest and best or most profitable use for the remaining portion of Section 31 after the imposition of the Forest Service Road?

"A Yes.

"Q What was that, sir?

"A The same as before, for immediate logging."

\* \* \* \* \* \*

"Q What kind of market is there for this cut-over land?

"A There is a good market for it.

"Q Is it the same market as there would be for the timber land on Section 31?

"A I think that the market is representative generally of properties throughout the area. A purchaser of Section 31 would log it, and then he would have cut-over timber land he could do what he wanted to with, he could either sell it to somebody for some other purpose or he could retain it for his own use."

\* \* \* \* \* \*

"Q Now, when you talk about immediate liquidation, how long would immediate liquidation take?

"A On this property?

"Q Yes.

"A Well, it depends on who would do the work. Now, there is about twenty six million feet of timber left there and McCloud or Kimberly Clark or U. S. Plywood Company could log that in one year. The U. S. Plywood Corporation cuts 132 million feet a year and Kimberly Clark cuts around 75 million, and that would only be about half of what they would need, and it could be logged out in one sea-

son, I think if a competent logger took charge of it."

\* \* \* \* \* \*

"Q Well, what sort of—you have imagined a purchaser here who would use this for immediate liquidation. Now, what sort of plans did you have in mind other than getting the timber out as fast as possible?

"A When you take timber out, when you are going to clear cut a piece of property, you set up certain strategic locations and you log to those and you don't attempt to save any of the trees that you are not forced to leave, and it is what they call a highball logging operation. You get everything out in a big hurry. You send in dozens of sets of fallers and you use three or four sides and a side consists of loading and skidding, and so forth, and I don't think that it makes too much difference."

## APPENDIX C

"THE COURT: Now, Lady and Gentlemen of the Jury—we lost our lady so it is just Gentlemen of the Jury, the reason for the delay is that the attorneys and the Court have gone over a great number of things since our recess yesterday, including the supplement of the instructions that I should give you. Each of these attorneys has his own set of instructions as to what he thinks I should tell you with reference to what is the law and that has now been determined. But there are other things that we have considered in this interim.

We have discussed the questions concerning the final acceptability of certain evidence into the record for your consideration.

Now, the ultimate object of this discussion was to determine if there was any evidence not yet ruled upon which should not be considered by you in your final deliberation on the main issue of this case, namely, just compensation.

During the trial I have indicated to you on more than one occasion that the opinion of a so-called expert witness is only as good as the reasons that back it

up. That is, the reasons and the knowledge upon which it is based. In some instances opposing experts may view the same facts in a different way. They may interpret them differently, and therefore, may read different conclusions from the same set of facts. They have a perfect right to do this and it is for you, the Jury, to decide which reasons or which interpretation of the facts seems more logical or correct. And then it is for you to decide which of the opposing opinions you will accept to guide you.

For an expert to base his opinion on facts as the expert chooses to interpret the facts is one thing. But for an expert to base his opinion on erroneous facts is something else. Such an opinion not only becomes quite questionable as to its value, but if the assumed facts are so basic to the opinion that the expert would have to substantially change his opinion if he had known the true facts, then his opinion may become entirely valueless to the Jury because it would be impossible for the Jury to determine what the opinion of that witness would have been if he had given consideration to the true and correct facts.

Now, we have such a problem in this case in the valuation opinion of Mr. Wall, one of the valuation witnesses for Scott Lumber Company. Mr. Wall admitted in reaching his opinion as to the before and after value of the property in question he did not know that the Southern Pacific Company and its assigns and successors had a right to cross the property or transport timber across Section 31. Yet the record contains uncontradicted evidence that the Southern Pacific did have such a right. Additionally, he assumed that as of May 18, 1960, the United States Government had no right to utilize the road system on the property whereas the evidence has been established without contradiction that these roads could be used by the Forest and other officers of the United States on official business.

Mr. Wall assumed that as of 12:01, May 18, 1960, Scott Lumber Company would not be permitted to skid logs or conduct landing operations on the new Forest Service Road, yet the uncontradicted evidence demonstrates that a prospective purchaser as of that date would have learned that the Forest Service had determined that any owner of the property in question could continue such use upon the new road within certain limitations.

Mr. Wall assumed that Scott Lumber Company or a new purchaser would be charged a proportionate share of the cost of building the new road system measured by the timber Scott or its successors or assigns might take from Section 31 over the new road. Yet the evidence is uncontradicted that as of May 18, 1960, a prospective purchaser would have been able to determine that as of that date a determination had been made by the Forest Service that no such charge be levied.

Mr. Wall assumed that as of May 18, 1960, the public would have free and unrestricted use of the new road, yet the evidence is uncontradicted that a prospective purchaser would have been able to learn as of May 18, 1960, that the Forest Service had determined that the new road was to be designated a Special Service Road and as such would be devoted to lumbering activities and as such the public would be precluded from its use from 7:00 a. m. to 7:00 p. m., Monday through Saturday.

Whereas it is true that the policy of the Forest Service regarding these last three mentioned items might change, as has been suggested by Mr. King, that is, that there might be a change of policy, nevertheless, the facts with which we must here be concerned are those facts which were available May 18, 1960. Since Mr. Wall assumed the condition to be contrary to the facts that have been proven, his opinion is rendered as inaccurate as his assumptions.

Mr. Wall assumed a factor in the amount of $37,500 for unforeseen contingencies as costs for which there was no demonstrable basis, in fact, or market data. He arrived at this by assessing $1.50 to each one thousand board feet of lumber taken from Section 31 for this contingency. The falacy (sic) of this

kind of speculation in arriving at value is demonstrated by the question, 'Why did he decide on $1.50 per thousand?' He did not back it up by evidence of actual costs, and the Jury might just as well speculate as to why the figure should not have been 50 cents per thousand or $5. per thousand. I will instruct you later that neither a witness nor a Jury may indulge in speculation in arriving at just compensation, that is exactly what Mr. Wall did in this instance which, therefore, makes his opinion evaluation defective.

Therefore, because of the erroneous assumptions of fact mentioned above which were utilized by Mr. Wall in arriving at his opinion of value, I have concluded that his before and after valuations of the property should be stricken from the record and should not be used by the Jury, and I so instruct you. In other words, I am instructing you that his valuation testimony, both as to the before value and the after value, is stricken from the record and you are not to consider it. Now, this does not mean that the rest of Mr. Wall's testimony may not be considered by you and given whatever weight you feel it deserves in light of other instructions I may give you. And, further, I want to instruct you that I do not mean to impune (sic) Mr. Wall's integrity in any way that he was trying to put something over. It boils down strictly to the question of whether he assumed the correct facts or the wrong facts in reaching his opinion, and I have reached the conclusion that he made wrong assumptions, erroneous assumptions, and because he did that he gives us valuation testimony that would be too difficult for the Jury, or for anyone else, to be able to take apart and put back together in view of the fact that he had these erroneous assumptions for the basis of his opinion.

Now, additionally, we have had some other problems having to do with the testimony of Mr. Sanders who was the other valuation witness for the Scott Lumber Company. I have previously instructed you that the testimony of Mr. Sanders with reference to the before valuation of the property, namely, $841,796 should be stricken, and I have previously stated my reasons for striking that testimony. In other words, we never could find out the basis upon which he put any land value into the property. You will recall that I questioned him repeatedly as to whether he got it out of the air, where did he get it, and we never could get an answer, and the result is I was compelled, because again he can't speculate and it has got to have some factual basis we couldn't find, at least in his testimony, and, therefore, I was compelled to strike his before value. He never did give us an after value so we are not concerned with that.

Now, one other part of Mr. Wall's testimony that we must strike—I am sorry. —Mr. Sanders' testimony we must strike had to do with his before and after value of timber, and the reason that this must be stricken is that unless such an item, unless such a cost or value is used by someone in arriving at an opinion as to value, before and after, it can't stand alone. It has got to be used. And it was expected that somewhere along the line some other valuation witness might use these timber values—when I say 'valuation witness' I am talking about a valuation witness as to the entire parcel, both the land and the timber combine—that some other unit valuation witness would use that testimony as to the timber values, before and after, but no one did. Mr. Wall admitted he did not and there was no one else to testify. Therefore, the law requires me to strike Mr. Sanders' testimony as to the before and after value of the timber, and so I do strike it, and I instruct you to disregard it.

He gave a figure of $675,000 as to the before value of the timber and $507,700 as to the after value of the timber. Now, you are not to consider those figures. If you have them in mind you must disabuse your mind and your thoughts of those figures because they can't be considered by you in light of this instruction that I am now giving you.

Now, he also gave some testimony concerning the specie value that he said that

the timber contained in Section 31, that there was so much Incense Cedar, so much Ponderosa Pine, so much White Fir, Red Fir, so forth. He gave you the individual value of that timber. Then he gave you the quantity. Well, because that would add up to the figures that I have already stricken, I am compelled to instruct you to disregard those figures also because it would come out to the same conclusion and they may not be used.

So that is the status of the testimony and the evidence as I now rule on it."