[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the plaintiff, Morris Seigel Realty Inc., (Seigel) from a total taking on June 22, 1992, for highway purposes by the defendant Commissioner of Transportation (Commissioner) of the plaintiff's property at 304 Skiff Street in North Haven. This appeal seeks a reassessment of the damages which the Commissioner set at $230,000.00 for the taking.
The subject premises, which encompasses 9148 square feet (0.21 acre more or less), are improved by a two and one-half CT Page 2829 story building and a four bay garage. The property which was originally in a residential zone was, at the time of taking, in (N20 Neighborhood Commercial). Generally speaking, this zone permits a mixed use of commercial-retail and office uses. The building was a former residence which has been converted for use as offices. The plaintiff used the premises at the taking and for some time prior for its real estate offices. This building consists of the first and second floor each of which contains 912 square feet and a "finished" attic[1] containing approximately 700 square feet., includes the first and second floor each of which contain 1011 square feet, a 36 square foot entrance foyer from the exterior. There is also handicapped access. On the rear of the subject property is the four bay garage which encompass some 800 square feet.
The property is located on the south side of Skiff Street not far from its intersection with Whitney Avenue. Both Whitney Avenue and Skiff Street are well-traveled. The subject property enjoyed an easily accessible location for the real estate business conducted on it by the plaintiff.
At the trial four witnesses testified, three of whom were offered as experts. The plaintiff's expert was Fred LaGreca, Warren Seigel,[2] who was the president and owner of the plaintiff also testified. The defendant called Linda McQuillan and Peter Kilbride as experts. Each of the three experts adopted different approaches in rendering their respective opinions on value. As to the expert opinions of fair market value as of the date of taking, LaGreca's opinion was $310,000.00, McQuillan's opinion was $230,000.00 while Kilbride's was $246,600.00. The evidence on this appeal was conflicting. The court visited the site in the presence of counsel after the trial.
"It is the court's duty to award just compensation to an owner whose property is taken for public use. The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value. . . . Put in another way, the rule is that the trier must take into consideration everything by which value is legitimately affected including those actors which a willing buyer and CT Page 2830 willing seller would consider in fairly and advantageously negotiating an agreement. . . ."
Wronowski v. Redevelopment Agency, 180 Conn. 579, 586 (1980).
"The function of the trial court in condemnation cases is to determine as nearly as possible the fair equivalent in money for the property taken." Alemany v. Commissioner of Transportation,215 Conn. 437, 444 (1990).
The referee is the final judge of the credibility of witnesses and the weight to be given their testimony. Morgan v. Hill, 139 Conn. 157 (1952). In this process the "trier's acceptance and use of the testimony on some points does not preclude its injection in others." Morgan v. Hill, supra 162; see Stanley Works v. New Britain Redevelopment Agency, 155 Conn. 86,99 (1967). The opinion of any expert is not binding upon the court. Birnbaum v. Ives, 163 Conn. 12, 20 (1972). The purpose of offering in evidence the opinions of experts is to aid the trier to arrive at his own conclusion which is to be reached by weighing those opinions in light of all the circumstances in evidence of bearing upon value and his own general knowledge of the elements going to establish it . . . ultimately, the determination of . . . value . . . depend[s] on the considered judgment of the referee taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties. . . . Bennett v. New Haven Redevelopment Agency,148 Conn. 513, 516 (1961); see Greenfield Development Co v. Wood, Commissioner, 172 Conn. 446, 453 (1977) see Gentile v. Ives,159 Conn. 443, 451 (1970). The visual observations made by the trier in a visit to the property are just as much evidence as evidence presented for its consideration under oath. Birnbaum v. Ives, supra. In sum, a state referee sitting on appeals in condemnation cases "is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. . . ." Minicucci v. Commissioner of Transportation, 211 Conn. 382, 388
(1939) quoting Birnbaum v. Ives, supra. 21-22, see also Feigenbaum v. Waterbury, 20 Conn. App. 148, 152 (1989).
As noted all three experts took different approaches to their ultimate opinion of fair market value of the subject CT Page 2831 property. Three generally accepted methods of valuation are the income approach, the cost approach and the sales comparison approach. Each of these were referred to and used in the trial of this appeal. In its determination of fair market value, the court may select that method it deems most appropriate to the case before it. D'Addario v. Commissioner of Transportation,180 Conn. 355, 365 (1980); Laurel Inc. v. Commissioner of Transportation, 180 Conn. 14, 37-28 (1980); Research Associates, Inc. v. New Haven Redevelopment Agency, 152 Conn. 137, 142-143
(1964). LaGreca employed the income and sales comparison approaches. In doing so, he noted, inter alia, that the latter acted "as a guide and check to the estimate of Market Value derived from the completion of the Income Approach" and he did not use the cost approach which he believed unsuited to this matter. McQuillan placed the most weight upon the sales comparison approach as well as developing to the Cost Approach. McQuillan used the cost approach as support, however, because there was sufficient market data available to establish a land value. She did not develop the income approach, indicating there "is a general lack of income and expense information for this type of property" which "is typically purchased for owner occupancy more intent to benefit from the Amenities than as a source of investment income." Kilbride pointed out that he developed the cost approach using the Sales Comparison approach to value the land and the Marshall Valuation Service to estimate the depreciated values of the site improvements and the building. In his development of the sales comparison approach he noted there was ". . . a limited number of converted residential building sales in the Hamden/North Haven market area, (FN) resulting in a sufficient number of comparable sales to develop a unit of comparison." In explaining why he did not develop the income approach, he stated that he did not do so because "the subject property use and size is more appropriate for use and/or purchase by an owner/occupier more interest upon the amenities of the property for a business identity, rather than a source of investment income."
In carrying out the constitutional command that the owner of land taken by condemnation is entitled to be paid just compensation, see Conn. Const. Art. I, 11; Greene v. Burns, Commissioner, 221 Conn. 736, 745 (1992), it is clear that the amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the talking. Greene v. Burns, Commissioner, supra; Minicucci v. Commissioner of Transportation, supra 384. There CT Page 2832 appears to be relative agreement between all three experts that the highest and best use of the subject is essentially one of commercial utility. Specifically, LaGreca opines that given the present zoning a commercial office or mixed ability [represents its] highest and best use." McQuillan considers that use "to be its continued use as offices" while Kilbride says that "the current use as an office building . . . represents the maximized use of the land."
As noted LaGreca placed the greatest weight, in reaching his opinion, upon the income approach to valuation. Under that approach value is arrived at by determining the net earning power of the particular property based upon the capitalization of the net income. According to LaGreca this appraisal technique, as he used it, involved: the estimation of annual gross potential income, based on actual leases in effect and/or comparable rental data, the deduction from that of the estimated loss of income coming from vacancies and/or non-collections to arrive at an estimate of gross effective income, the estimation of expenses anticipated in operating the property, then the deduction of the total expenses from the gross effective income to yield an estimate of net operating income (NOI) and finally the selection of a capitalization rate which is applied to the NOI to arrive at a valuation of the property being appraised. In this approach it can be seen that the anticipated NOI is ultimately processed to indicate the capital amount of the investment on the property being appraised that produces the NOI. Thus, the purpose of this approach is to estimate the present market value of a property based on the present capitalized value of future anticipated income. As was indicated at the trial the capitalization rate was selected by reference to return requirements of equity and capital markets; that rate is then used to convert the NOI into an estimate of value. Formula-wise, the value estimate would be the NOI divided by the capitalization rate selected.
The other two experts regarded the income approach as inappropriate pointing that this approach is better where property is owned or investment income rather than for owner-occupancy use with the amenities accompanying such a use. There is merit to this position as the evidence supports this latter type of use by this appellant. It is generally considered that the income approach is the preferable approach to value as to properties owned for income purposes. See e.g. 27 Am.Jur.2d, Eminent Domain, 286. CT Page 2833
In any event, the court is not inclined to adopt the income approach to value in this case given the evidence before it. We start recognizing that in a condemnation case, any opinion of fair market value, whether derived from the income, cost or sales approaches are only as convincing as the formulation data upon which it rests. United States v. 1.16 Acres in the City of Stamford, Connecticut, 300 F. Sup. 1021, 1023 (D. CT 1969). As did the other two experts LaGreca's evidence disclosed problems with the square footage of the building which he used in his calculations. In addition his use of the number of square footage he used in the third floor or attic, as that played into his ultimate opinion of value, was of doubtful probative validity. This is particularly so because although he said that it could be rented for storage, the plaintiff never answered the Commissioner's evidence that according to the North Haven Building Inspector that attic could not be legally leased and/or used because it had, inter alia only one means of ingress and egress. The credible evidence indicated that this attic could not be legally utilized for the same purposes as the first and second floors.
The vacancy factor given at 5% is low and of questionable probative value. On the evidence adduced on the income approach this estimate is not credible. A more realistic rate which would he more than 5% would as it constitutes an element of the income approach, yield a result under the income approach that would not excessively penalize the property in "bad times" nor inflate its value in "boom times" as it is axiomatic that a reasonably prudent investor will provide a safety margin in calculating a weighing the relative attractiveness of a new investment. See In Re Cross-Bronx Expressway, Borough of the Bronx, 82 N.Y.S.2d 55,71 (1948).
LaGreca's appraisal offered in evidence by the plaintiff as an exhibit contained 14 separate properties utilized for "Comparable Rental Data" which stated that from that it was concluded that a $12.00 per square foot market rental was appropriate to be applied to the subject property in his income approach analysis. It further indicates that eight of the fourteen were not actual lease rental figures but were merely "asking" or "offering" prices per square foot. The use or the fourteen properties in his written report, is inconsistent with his oral testimony at trial that only the six actual lease figures were used. CT Page 2834
The court cannot accept the plaintiff's choice of and/or the results of the income approach.
Something should be said of his use of the comparison sales approach which LaGreca said was used, inter alia, to act "as a, guide and check" to his estimate of value derived from his use of the income approach. Evidence or actual sales of property that can fairly be called comparable to the property condemned has "considerable probative value" as market value as the price fixed by an open market sale under normal and fair conditions, is a recognized test of such value. 4 Nichols, Eminent Domain (Rev. 3d. ed. 1389) 12B.04(3). Nichols points out that this is so because this is truly where "money talks". Id. LaGreca indicated that he could find no actual sales which he considered comparable. He, therefore, in his comparison sales analysis, employed right "comparable" properties all of which were properties listed on the market as available for sale. The court, as indicated below, concludes from the credible evidence that there were actual sales of comparable properties. It, however, is interesting to point out that, of these eight properties used by LaGreca, the one that appears from the evidence to be the closest to the subject property is #214 Skiff Street on which the asking price is $249,000. It is older than the subject and has no garage. It is, however, similar in size (both the two story converted residence thereon and the land area), has parking, can be used for professional offices and also located on a busy section or Skiff Street near its intersection with Whitney Avenue as is the subject. The significance of the difference between the asking price of $249,000 vis a vis the $310,000 figure put on the subject by LaGreca was not resolved by the credible evidence even though it is only one of the eight "comparables" but it is quite close to the subject. Briefly, the court cannot accept the use of the income approach to value as well as its claimed "corroboration" by the comparison sales approach.
The expert Kilbride's evidence indicated that he developed the cost approach using the sale comparison approach to value the land and the Marshall Valuation Service" to estimate the depreciated value of site improvements and the building. His opinion of value, thus derived, was $246,600.
The cost approach to value involves: (1) the estimate of the value of the land as if vacant, (2) the estimate of the current cost of reproducing the existing improvements, (3) the estimate CT Page 2835 and deduction of all depreciation and (4) the addition or the value of the land as estimated to the indicated value of the improvements thus, yielding an estimate of value.
Kilbride also had problems with the number of square footage he attributed to the building. His valuation of the site improvements were taken from the Marshall Valuation Service as well as from discussions with a local contractor. The inclusion however, in the cost approach of the element of depreciation, as it plays into the ultimate opinion of value, lessens the propriety of the income approach with older buildings in that the estimate of the total depreciation of the building becomes more difficult, if not somewhat speculative with older buildings. This building, albeit converted, is at now about 54 years old. Moreover, the building is not unique and that with an older building militates against employing the cost approach. See Whitney Center Inc. v. Hamden, 4 Conn. App. 426, 428 (1985).
In his brief, the plaintiff argues that McQuillan's testimony should be "discounted substantially" because or he status as a full-time employee of the Commissioner and because her testimony failed to provide probative evidence of value. There is no evidence before the court in this case to lead this court to so discount this witness testimony just because of her employment status. The probative quality of her evidence, as well as all the other evidence, has been assessed in accordance with the applicable in this case law.
Going on, the court, in this case, believes that the approach on value used by McQuillan is to be utilized. In arriving at her opinions of value she used the sales comparison approach, upon which "the most weight was placed". She also used the cost approach as, in her view, there was sufficient market data to establish an estimated land value. She also said that the cost approach established "a supportive measure to the Sales Comparison Approach." McQuillan's opinion of value using the sale comparison approach was $230,500. and using the cost approach it was $227,000. Her ultimate opinion of fair market value was $230,000.[3]
Because no two pieces of land are exactly alike, it is to be kept in mind that the comparison is made with land which is similar to that taken and, accordingly, no general rule can be laid down regarding the degree of similarity. 5 Nichols, Eminent Domain 21.3[3], 21.31; 27 Am.Jur.2d, Eminent Domain 1429, p. CT Page 2836 433. Generally speaking comparability is a function of three variables: characteristics of the properties, their geographical proximity and the time differential. See United States v. 320.0 Acres or Land, more or less, 605 F.2d 762, 798 (5th Cir. 1979). see United States v. 0.161 Acres of Land, (11th Cir. 1988). One court has pragmatically, said: "in most cases, of course, there are no open market sales `ideally' comparable (i.e. virtually identical characteristics, immediate vicinity, and within a short time of the taking), but instead an assortment of sales that are only reasonably comparable in all or several respects." United States v. 320.0 Acres of Land, more or less, supra. The more comparable, however, the comparables advanced, the more probative they are of the fair market value of the subject, United States v. 826.0 Acres of Land, 605 F.2d 762, 785 (5th Cir. 1979); 5 Nichols, op. cit. 21.3[1]. Parenthetically, we note that there are course which have said that comparable sales are the best evidence of value. See e.g. United States v. 421.89 Acres of land, more or less, 465 F.2d 336, 339 (8th Cir. 1972); United States v. Whitehurst, 337 F.2d 765, 775, (4th Cir. 1964), United States v. 100.80 Acres of Land, 657 F. Sup. 269, 275
(M.D.N.C. 1987), see Warwick Musical Theatre, Inc. v. State,525 A.2d 905, 910 (R.I. 1987). ("preferred method")
The three properties used by McQuillan as comparables all actual sales, were fairly comparable both in size and use, i.e. office use. The similarity also included their topography, availability of utilities and their present use which, as to each, was found to be the highest and best use. Moreover, their location and time of sale also contribute sale also contribute to the acceptance of the value approach taken by McQuillan. The court finds that the highest and best use of the subject property is for office use.
The plaintiff argues that McQuillan did not attribute any value whatsoever to the attic "even though it may have been used in conjunction with the office use of the first two floors." It is so that McQuillan's did not attribute any value to the attic. It is also true that Kilbride did not do so either. McQuillan evidence on this aspect included her testimony that, having talked to the North Haven Building Inspector, she learned that the attic could not legally be used for the same purposes as the other two floors, and that it could not be leased legally. The circumstance that there is only one means of ingress and egress to the attic plays significantly into the legality of its use. McQuillan, therefore, said this is why she attributed no value to CT Page 2837 the attic. Kilbride indicated that the attic might be considered as a sort of auxiliary user such as for storage, only for as long as the Town of North Haven did not find out about it. This evidence came in without objection and is credited.
In this context, we note that there is respectable authority for the view that the availability of land for a use which is prohibited by law cannot he considered in determining its value in eminent domain proceedings. Gear v. City of Phoenix, 379 P.2d 973,974 (Ariz. 1963); July v. City of Salem, 177 N.E. 121 (Mass. 1931); Scott Lumber Co. v. United States, 390 F.2d 388, 395 (9th Cir. 1968); Kingsland v. Mayur, 110 N.Y. 569, 18 N.E. 435 (1888), Parker v. Bradley, 266 Ill. App. 507 (1932) cited in Orgel on Valuation under Eminent Domain, 33 n. 145. In this case the court concludes that no value could be attributed to the attic.
The plaintiff's brief also argues that McQuillan's comparable at #1722 Whitney did not consider that while it was available for office use that was only so if it was used as for offices by a resident of that house, that argument has some merit. In addition, while McQuillan did not consider any square footage of the subject below ground level such as in the basement her testimony was amenable to the use of some of square footage of that type or area in two of her comparable sales.
The court finds, on the law and credible evidence, that the appellant is aggrieved.
Accordingly, it concludes on the law and the evidence that just compensation in the amount of TWO HUNDRED FORTY-FIVE THOUSAND DOLLARS, i.e. $245,000.00 is to be and is awarded to the appellants plus interest on the excess of the sum of $230,000.00 from June 22, 1992.
Finally, the plaintiff asks for appraisal fees for his expert. General Statutes 13a-7b is the statute that is "the authority for a landowner's recovery of appraisal fees in highway condemnation cases." Alemany v. Commissioner of Transportation,215 Conn. 434, 449 (1996). The statute provides that whenever the court determines that the Commissioner's assessment is inadequate, as here, the court "shall award to such property owner such appraisal fees as [the court] determines to be reasonable." What constitutes a reasonable amount is a question of fact. French v. Clinton, 215 Conn. 197, 205 (1990). It is ordered that appraisal fees be paid in the amount or $2,500.00. CT Page 2838
Judgment for the plaintiff is entered in accordance with the foregoing.
Arthur H. Healey State Trial Referee